OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Justine Michael, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

Fantozzi et al., Appellees and Cross-Appellants, v.
Sandusky Cement Products Company, Appellant and Cross-Appellee,
et al.

     [Cite as Fantozzi v. Sandusky Cement Prod., Co.
(1992),     Ohio St.3d    .]

Civil procedure -- Trial court commits reversible error
     ordering a prerecorded videotape trial over the objections
     of both parties to the action, when -- Torts -- Negligence
     -- Damages -- When individual suffers personal injuries,
     question of damages for "loss of ability to perform the
     plaintiff's usual functions" may be submitted to the jury
     in an instruction, and set forth in a special
     interrogatory and separate finding of damages, when.

1.   It is reversible error for a trial court to order a
     prerecorded videotape trial over the objections of both
     parties to an action unless the court reflects in a
     journal entry that it has, pursuant to C.P.Sup.R. 12(B),
     consulted with the attorneys for the parties and
     considered the costs involved, the nature of the action
     and the nature and amount of testimony, that these factors
     taken together indicate a compelling reason to conduct the
     trial by videotape and that no cognizable prejudice will
     be suffered by the parties.  (Civ.R. 40, applied;
     C.P.Sup.R. 12[B], construed and applied.)

2.   Where an individual suffers personal injuries, the
     question of damages for "loss of ability to perform the
     plaintiff's usual functions" may, when evidence thereon
     has been adduced, be submitted to the jury in an
     instruction, and set forth in a special interrogatory and
     separate finding of damages, provided, however, that the
     court instructs the jury that if it awards such damages,
     it shall not award additional damages for that same loss
     when considering any other element of damages, such as
     physical and mental pain and suffering.

     (No. 91-1169 -- Submitted April 29, 1992 -- Decided
September 9, 1992.)

     Appeal and Cross-Appeal from the Court of Appeals for Erie
County, No. E-89-36.

     On January 25, 1986, defendant-appellant and

cross-appellee, Sandusky Cement Products Company ("Sandusky Cement"), through its employee-agent, Daniel Mulvin, delivered and offloaded ready mix concrete from a truck onto the premises of the New Departure Hyatt Bearings Division of General Motors located in Sandusky, Ohio. Plaintiff-appellee and cross-appellant, Peter A. Fantozzi, was involved in spreading and finishing the concrete that was offloaded from the truck.

The concrete was offloaded by means of metal chutes that were made in sections which connected to form a continuous chute. According to Fantozzi, at least one section of the metal chutes being used by Sandusky Cement was warped out of shape so that it could not properly connect to the other sections. Fantozzi alleges that as a direct and proximate result of the reckless, willful and wanton negligence of Sandusky Cement and the other defendants (Henry Hoover, Daniel Mulvin and Chuck Mulvin), a warped chute fell and struck him, causing physical injury, pain and suffering, and preventing him from pursuing his employment.

Fantozzi sought medical treatment for his claimed injuries on several occasions. Specifically, on the day of the injury he went to the plant infirmary, but then returned to the job site until work was completed. On January 27, 1986, Fantozzi visited a Dr. Gillette, who prescribed pain medication and physical therapy for his problem. Subsequently, while vacationing in Florida, Fantozzi complained of pain in his neck, shoulders and arm. Consequently, Fantozzi sought treatment at Memorial Hospital in Ormond Beach, Florida. Upon his return to Ohio, Fantozzi was admitted first to Providence Hospital by Dr. Gillette and then to Good Samaritan Hospital by a Dr. Rist, who prescribed traction and therapy. Fantozzi was also treated by James R. Berry, M.D., who prescribed a traction device and a TENS unit to be used at home. Dr. Berry referred Fantozzi to a neurosurgeon, Fred A. Brindle, M.D., who had Fantozzi consult with a Dr. Brausch. Dr. Brindle conducted a cervical myelogram on Fantozzi and Dr. Brausch conducted an electromyogram. Fantozzi was also examined by a neurologist, Dr. Herbert S. Bell, who could not alleviate his symptoms. Finally, Dr. Brindle referred Fantozzi to Firelands Hospital for pain management, which taught him how to cope with his pain on a day-to-day basis.

Fantozzi's treating physician, Jonathan Ford Diller, M.D., determined that Fantozzi was totally, permanently impaired such that he would not be able to return to any form of employment involving significant physical exertion. Moreover, Dr. Diller concluded that Fantozzi's injury was caused by the collapse of the cement chute.

On July 6, 1988, Fantozzi, along with his wife, plaintiff-appellee and cross-appellant Nancy Fantozzi, filed a second amended complaint with a jury demand alleging reckless, gross, willful, wanton and negligent conduct by Sandusky Cement and its agents, which caused the injury to Mr. Fantozzi. Furthermore, Mrs. Fantozzi alleged that defendants' acts deprived her of the services, aid, love and companionship of her husband in the past, present and future. On December 28, 1988, the trial court assigned the case for a videotape trial pursuant to Civ.R. 40, C.P.Sup.R. 12(B) and Loc.R. 15 of the Court of Common Pleas of Erie County, and allowed counsel for

both sides to raise "any serious objections" within ten days.

On January 6, 1989, both sides filed joint objections to the videotape trial order. The objections stated, inter alia, that Mr. Fantozzi could not finance the cost of the videotape depositions; that due to the nature of the factual issues, the videotape format would not provide the jury with a complete opportunity to judge the credibility of the witnesses as to body language, attitude and appearance; and that attorneys for both sides had heavy trial schedules which made it impossible to adequately prepare for the videotape trial schedule assigned by the court. All parties requested that the trial proceed as originally scheduled, and not as a videotape trial.

The trial court never ruled on these objections, and on January 26, 1989, the parties agreed to a modification of the original videotape trial schedule. The videotape trial commenced on April 24, 1989 and lasted through May 1, 1989. On May 1, 1989, the jury returned a general verdict for Mr. Fantozzi in the amount of $744,120. Mrs. Fantozzi received $40,000 for loss of consortium. The jury determined in a special interrogatory that Mr. Fantozzi's damages were:

        Past medical expenses: $14,000
        Past lost wages: $120,120
        Past pain and suffering: $25,000
        Past loss of life's enjoyment: $25,000
        Future medical expenses: $60,000
        Future lost wages: $400,000
        Future pain and suffering: $60,000
        Future loss of life's enjoyment: $40,000

Moreover, the jury found Mr. Fantozzi to be ten percent negligent, while Sandusky Cement was ninety percent negligent. Thus, the trial court reduced the award proportionately, leaving a total of $669,708 for Mr. Fantozzi and $36,000 for Mrs. Fantozzi.

The court of appeals affirmed the trial court's judgment in part, reversed it in part, and remanded, holding, inter alia, that the trial court did not abuse its discretion in ordering the trial to be conducted by videotape over the objections of the parties. However, the court of appeals held that the trial court did err in instructing the jury that it could take into consideration damages for past and future loss of enjoyment of life. The court reasoned that given the injuries set forth in the complaint, damages for the loss of enjoyment of life would fall within the confines of damages for pain and suffering.

The cause is now before this court pursuant to the allowance of a motion and cross-motion to certify the record.

Crandall, Pheils & Wisniewski and David R. Pheils, Jr., for appellees and cross-appellants.

Manahan, Pietrykowski, Bamman & DeLaney, Gerald R. Kowalski and William F. Pietrykowski, for appellant and cross-appellee.

Holmes, J. The two issues before this court are whether the trial court committed reversible error when it ordered the parties, when they had objected, to participate in a videotape trial, and whether the trial court committed prejudicial error

when it provided the jury with a separate interrogatory concerning damages for past and future "loss of life's enjoyment."  For the reasons that follow, we answer the first query in the affirmative and the latter in the negative.

I

## Videotape Trials

In Sandusky Cement's sole proposition of law, it asserts that a court order to conduct a videotape trial over the objections of both adversarial parties constitutes "an abuse of discretion" by a trial court.  In order to thoroughly appreciate the breadth of this issue, a brief background on videotape trials is indicated.  The videotape trial format discussed here is not the presentation into evidence at a conventional trial of videotapes of certain evidence such as the testimony of expert witnesses.  The videotape trial that we discuss in this case is a trial in which all of the testimony, including that of any expert witnesses, is prerecorded on videotape and later shown to the jury on a video screen.  Trial by videotape is a modern process presented as an alternative to traditional trial methods.  The basic premise behind such trials is that they save judicial resources by providing a quicker means for bringing a case to trial.

The first videotape trial, McCall v. Clemens, No. 39301, took place in the Common Pleas Court of Erie County, Ohio, on November 18, 1971, under the direction of Judge James L. McCrystal.  See Symposium, First Videotape Trial: Experiment in Ohio (1972), 21 Defense L.J. 266; McCrystal, Videotape Trials: Relief for our Congested Courts (1973), 49 Denver L.J. 463.1 The McCall videotape trial was conducted with the consent of both parties to the action and in the absence of any statutory or rule standardization.  See Symposium, supra, at 268; Staff Note, Civ.R. 40.

In response to McCall, this court, under the direction of then Chief Justice C. William O'Neill (see McCrystal & Young, Pre-Recorded Videotape Trials - An Ohio Innovation [1973], 39 Brooklyn L.Rev. 560, 561), submitted new Civ.R. 40, effective July 1, 1972, which provides that:

"All of the testimony and such other evidence as may be appropriate may be presented at a trial by videotape, subject to the provisions of the Rules of Superintendence."  See Staff Note, Civ.R. 40.

Effective September 1, 1972, former S.Ct.Sup.R. 15 (superseded by C.P.Sup.R. 12[B] and M.C.Sup.R. 10[B]) set forth specific guidelines for the use of videotaped testimony. C.P.Sup.R. 12(B) provides, in pertinent part:

"Videotape Trials.

"(1) Authority.  Videotape trials are authorized by Civil Rule 40.  In videotape trials, videotape is the exclusive medium of presenting testimony irrespective of the availability of the individual witness to testify in person.  All testimony is recorded on videotape and the limitations of Civil Rule 32 upon the use of depositions do not apply.

"(2) Initiation of Videotape Trial.  By agreement of the parties and with the consent of the trial judge all testimony and appropriate evidence may be presented by videotape.  The trial judge may order the recording of all testimony and evidence on videotape in an appropriate case.  In determining

whether to order a videotape trial, the trial judge, after consultation with counsel, shall consider the costs involved, the nature of the action and the nature and amount of testimony."

Judge McCrystal, writing a number of articles on the subject, has pointed out what are thought to be some distinct advantages in the use of prerecorded videotape trials.2

There also have been a number of articles that take a somewhat contrary position concerning videotape trials, pointing out some significant disadvantages in their use.  It is argued that such videotaping negatively impacts the effective communication of information to the jury.3

In reviewing the parties' objections to the videotape trial in the present case, we note that one of their concerns was the impairment of the jury's ability to judge the credibility of the testimony.  In the parties' joint objection to videotape trial, filed on January 6, 1989, they stated that:

"The testimony of the fact witnesses of Plaintiff and Defendant are [sic] so contradictory as to make the crucial issue one of credibility and the limited nature of videotape testimony does not offer the jury a full and complete opportunity to judge the credibility of such witnesses as to body language, attitude and appearance before and after taking the stand or the interplay between attorney-questioner and the witness * * *."

Sandusky Cement argues strenuously here that any advantages of conducting a trial by videotape must be balanced against the disadvantages of conducting a trial by such means.  Basically, Sandusky Cement argues that there are two major disadvantages of conducting a trial by such means.  First, the jury's vision is limited to that of the camera.  In the videotape trial, the camera is trained on the witness's head and shoulders, and thus the jury cannot see hand or body movements which may affect the witness's credibility.  Also, appellant argues that the videotape trial may unfairly weaken a party's presentation of evidence, especially impeachment testimony, since a witness has the opportunity to view the testimony of other witnesses before he testifies, and may adjust his own testimony accordingly.

Judges McCrystal and Maschari present many sound arguments in favor of prerecorded videotape trials, and the empirical data from their use in Erie County are very strong.  See McCrystal & Maschari, Will Electronic Technology Take the Witness Stand? (1980), 11 U.Tol.L.Rev. 239.  However, the opposition also has a number of valid points, including the fact that videotape trials have not gained widespread use, and are all but confined to Erie County.

However this debate may ultimately be concluded, we find valid reasons to support the use of prerecorded videotape trials.  In the appropriate case, the prerecording of trials by videotape may prove to be as beneficial as the videotaping of certain kinds of evidence, such as expert testimony, that is almost universally utilized.  In any event, we currently have rules promulgated by this court which authorize this process.  Until such authorization is withdrawn, this court must fairly interpret and apply the rules.

In determining whether the trial judge in the case sub

judge erred in ordering a videotape trial over the objections of both parties, we must look to the applicable rules4 in light of the Ohio and United States Constitutions.  Section 5, Article I of the Ohio Constitution provides: "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." The Seventh Amendment to the United States Constitution provides in relevant part: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *."  It may be argued that a videotape trial infringes upon what has been considered the traditional right to a trial by jury as contemplated at the time these constitutional provisions were drafted.  Thus, in determining the intent behind Civ.R. 40 and C.P.Sup.R. 12(B), the state and federal Constitutions are an indication as to the permissible procedure to be used by a trial court.5

Under Civ.R. 40, as further detailed in C.P.Sup.R. 12(B)(2), a prerecorded videotape trial may take place by the agreement of the parties, or where the court orders such a trial "in an appropriate case" even though all of the parties, or only some of the parties object.

C.P.Sup.R. 12(B)(2) provides in pertinent part: "In determining whether to order a videotape trial, the trial judge, after consultation with counsel, shall consider the costs involved, the nature of the action and the nature and amount of testimony."  (Emphasis added.)  The word "shall" is mandatory rather than directory and requires the court to consider the factors after consultation with counsel.6  See State ex rel. Niles v. Bernard (1978), 53 Ohio St.2d 31, 34, 7 O.O.3d 119, 121, 372 N.E.2d 339, 341, fn. 2; Malloy v. Westlake (1977), 52 Ohio St.2d 103, 106, 6 O.O.3d 329, 330, 370 N.E.2d 457, 459; State ex rel. Ewing v. Without a Stitch (1974), 37 Ohio St.2d 95, 103, 66 O.O.2d 223, 228, 307 N.E.2d 911, 917. This interpretation of the rule is proper in light of the state and federal constitutional significance which we recognize is placed upon the right to a trial by jury.

Accordingly, it is reversible error for a trial court to order a prerecorded videotape trial over the objections of all parties to an action unless the court reflects in a journal entry that it has, pursuant to C.P.Sup.R. 12(B), consulted with the attorneys for the parties and considered the costs involved, the nature of the action and the nature and amount of testimony, that these factors taken together indicate a compelling reason to conduct the trial by videotape and that no cognizable prejudice will be suffered by the parties.  In considering whether such error was prejudicial, the reviewing court should take into consideration the parties' constitutional right to trial by jury, giving substantial emphasis to the fact that all parties objected to a videotape trial.  The reviewing court should also consider any other factors that may have induced the trial court to order videotaping, with the underlying premise being that the trial court, under such circumstances, should be extremely cautious in entering such an order.  When the reviewing court cannot find any compelling reason for the trial court's order of videotaping over the objection of the parties, the order should

be found to be prejudicial error.

Where there is an objection to a videotape trial, and the trial court has consulted with counsel for the parties and filed an entry setting forth that the court has considered the factors of the rule, but still has ordered a videotape trial, a reviewing court should limit its inquiry to whether the trial court abused its discretion.

In the case at bar the trial court failed to respond to the parties' joint objections to the court's order to conduct a videotape trial. There was no journal entry reflecting that the trial court had consulted with counsel for the parties concerning their objections, no entry that the court had considered the factors set forth in C.P.Sup.R. 12(B)(2), and no entry of any findings of the court in this regard. Therefore, we conclude, in the absence of any supportive material to the contrary, that the trial court erred in this regard to the prejudice of Sandusky Cement, the party yet complaining of the videotape trial held over its objection.

Therefore, the judgment must be vacated and the cause remanded for a new trial.

## II
### Loss of Enjoyment of Life

In the Fantozzis' sole proposition of law on cross-appeal they allege that "loss of enjoyment of life is sufficiently different in nature from pain and suffering as to constitute a separate, identifiable item of damages."

Damages based on "loss of enjoyment of life" have been identified by a number of names or descriptions by legal authors and judicial opinions throughout the country, but in essence it is an allegation in a tort action that the plaintiff's capacity to enjoy certain activities of life has been impaired as a result of personal injury. See 22 American Jurisprudence 2d (1988), Damages, Section 272. In Huff v. Tracy (1976), 57 Cal.App.3d 939, 943, 129 Cal.Rptr. 551, 553, this type of damage was referred to as "physical impairment which limits the plaintiff's capacity to share in the amenities of life." This damage connotes the deprivation of certain pleasurable sensations and enjoyment through impairment or destruction of the capacity to engage in activities formerly enjoyed by the injured plaintiff.

Although this court has not specifically discussed the loss of enjoyment of life as an element of damages in a civil action, in Binns v. Fredendall (1987), 32 Ohio St.3d 244, 513 N.E.2d 278, we made a general reference to it as one element of allowable damages: "* * * [R]ecovery for negligently inflicted emotional and psychiatric injuries accompanied by contemporaneous physical injury may include damages for mental anguish, emotional distress, anxiety, grief or loss of enjoyment of life caused by the death or injury of another. We strictly limit such recoveries to those plaintiffs directly involved and contemporaneously injured in the same motor vehicle and accident with the deceased or other injured person." (Emphasis added.) Id. at 247, 513 N.E.2d at 281.

The court of appeals below, in citing Binns, stated that: "We interpret the Binns holding as being applicable only to actions where severe emotional injuries have resulted from the plaintiff's involvement in and witnessing of an accident in

which a loved one is killed or injured. The present case involves a situation in which the plaintiff claims loss of enjoyment of life due to the physical injuries themselves. * * *" The court of appeals concluded that Binns is not applicable to this case and, therefore, the trial court had erred in submitting the interrogatory on the damage element of loss of enjoyment of life to the jury.

It must be remembered that Binns dealt with a plaintiff who was involved in an auto accident in which a close companion was killed in a gruesome manner. This court recognized that she could recover for her own physical injuries, for the extreme mental anguish and emotional distress she encountered from her witnessing of the accident, and also for loss of the enjoyment of life that she would have otherwise experienced with her deceased close companion. The court within that context limited the right to recover for such injuries "to those plaintiffs directly involved and contemporaneously injured in the same motor vehicle and accident with the deceased or other injured person." Id., 32 Ohio St.3d at 247, 513 N.E.2d at 281.

In Binns, this court recognized that in certain situations where the plaintiff has received physical injuries as well as severe emotional injuries caused by the death or injury of another, the factfinder may consider claimed loss of the enjoyment of life as a part of the damages assessed. The language in Binns was not intended to limit the recovery of such damages to actions seeking recovery for emotional injuries which have resulted from the plaintiff's involvement in an accident in which he witnessed a loved one being killed or injured. Binns did not intend to prevent an injured party in an action seeking damages for physical injuries from also recovering damages for impairment of the plaintiff's usual pleasurable activities. Further, Binns did not discuss whether such a loss is a separate element of damages concerning which separate jury instructions may be given, and whether interrogatories for separate findings of damages may be submitted.

The fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained. Allison v. McCune (1846), 15 Ohio 726; Loeser v. Humphrey (1884), 41 Ohio St. 378; Brady v. Stafford (1926), 115 Ohio St. 67, 79, 152 N.E. 188, 192; Pryor v. Webber (1970), 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235, paragraph one of the syllabus. Compensatory damages are intended to make whole the plaintiff for the wrong done to him or her by the defendant. Id.; Lake Shore & Michigan S. Ry. Co. v. Hutchins (1881), 37 Ohio St. 282, 294. Compensatory damages are defined as those which measure the actual loss, and are allowed as amends therefor. For example, compensatory damages may, among other allowable elements, encompass direct pecuniary loss, such as hospital and other medical expenses immediately resulting from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering. See 4 Restatement of the Law 2d, Torts (1965), Section 903 et seq. These among other elements of damages are well known in Ohio jurisprudence and are allowable elements to be assessed by the

jury.  Some of these elements of damages, such as the costs and expenses of the injury and loss of time from employment, entail only the rudimentary process of accounting to calculate.  Other elements such as pain and suffering are more difficult to evaluate in a monetary sense.  The assessment of such damage is, however, a matter solely for the determination of the trier of fact because there is no standard by which such pain and suffering may be measured.  In this regard, this court has recognized that "no substitute for simple human evaluation has been authoritatively suggested."  Flory v. New York Central RR. Co. (1959), 170 Ohio St. 185, 190, 10 O.O.2d 126, 128, 163 N.E.2d 902, 905.

We have noted that recently in Ohio, as elsewhere, plaintiffs' attorneys have more frequently included an additional element of damage, which they generally term "loss of enjoyment of life," in complaints in personal injury actions.  Although this court in Binns did recognize that "loss of enjoyment of life" could be considered by the jury in assessing damage in the type of case presented therein, the question remains for our consideration whether such damage, be it known as loss of enjoyment of life or by another name, may be allowed in other types of negligence actions, and may be considered as a separate element of damages in the jury instructions, interrogatories submitted to the jury, and in a special verdict form.

Courts throughout the United States have differed on whether damages may be awarded for loss of enjoyment of life in addition to, and separate from, an award for other elements of damages such as pain and suffering, or an award for general damages.  A number of state courts of last resort have recognized the loss of enjoyment of life as a proper element of damages for personal injuries which may be separate and distinct from pain and suffering and other categories of damages.  Exemplary of these are: McAlister v. Carl (1964), 233 Md. 446, 197 A.2d 140; Mariner v. Marsden (Wyo.1980), 610 P.2d 6; and Swiler v. Baker's Super Market, Inc. (1979), 203 Neb. 183, 277 N.W.2d 697.

There are also a considerable number of cases from other states that, while disallowing or discouraging the claim of loss of enjoyment of life as a separate element of damages with its own separate jury instruction and separate award, have held that such claim could be properly considered by the jury in arriving at the amount for general damages.  See, e.g., Leiker v. Gafford (1989), 245 Kan. 325, 778 P.2d 823; McDougald v. Garber (1989), 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372; Leonard v. Parrish (Minn.App.1988), 420 N.W.2d 629; Nussbaum v. Gibstein (1989), 73 N.Y.2d 912, 539 N.Y.S.2d 289, 536 N.E.2d 618; Huff v. Tracy, supra, 57 Cal.App.3d 939, 129 Cal.Rptr. 551.  These courts have, in the main, determined that such a claim could not be a separate award, in that the plaintiff's loss of enjoyment of life is encompassed within one of the established elements of damages such as pain and suffering or permanency of injuries.  Accordingly, the court in Leiker v. Gafford, supra, stated: "One of the strongest arguments that has been advanced as a reason for not recognizing loss of enjoyment of life as a separate category of damages is that it duplicates or overlaps other categories of damages, such as

permanent disability or pain and suffering."  Id., 245 Kan. at 339, 778 P.2d at 834.  See, generally, Hermes, Loss of Enjoyment of Life -- Duplication of Damages Versus Full Compensation (1987), 63 N.D.L.Rev. 561; Annotation, Loss of Enjoyment of Life as a Distinct Element or Factor in Awarding Damages for  Bodily Injury (1984), 34 A.L.R. 4th 293; Comment, Loss of Enjoyment of Life as a Separate Element of Damages (1981), 12 Pac.L.J. 965.

How each jurisdiction has treated the issue of whether loss of enjoyment of life is an element of damage separate from other allowable damages such as pain and suffering, or permanent disability, has been dependent upon the elements of damages recognized in that particular state by statute, court rule, or case law.  In like manner, in order to answer the query presented here, we have looked to our Ohio laws and to Ohio Jury Instructions (1992)("OJI").

The pertinent instruction contained in OJI is Section 23.01, Personal Injury, which provides in part as follows:

"1. If you find for the plaintiff, you will determine from the preponderance of the evidence an amount of money that will reasonably compensate the plaintiff for the actual (injury) (damage) proximately caused by the negligence of the defendant.

"2. In determining this amount, you will consider the nature and extent of the injury; the effect upon physical health; the pain that was experienced; the ability or inability to perform usual activities; (the earnings that were lost) (the reasonable cost of necessary medical and hospital expenses incurred by the plaintiff).  From these you will determine what sum will compensate the plaintiff for the injury to date.

"3. PERMANENT INJURY AND EXPENSE.  You will note that the plaintiff also claims (that the injury is permanent) (that plaintiff will incur future expense) (that he will experience pain or disability in the future).  As to such claim(s), no damage may be found except that which is reasonably certain to exist as a proximate result of the (injury) (collision)."

Most important in the discussion of the issue presented here is subsection 2, providing that "[i]n determining this amount, you will consider * * * the ability or inability to perform usual activities * * *."  Also important here is subsection 3, which provides for claims that the plaintiff "will experience * * * disability in the future," and instructs the jury that damages therefor may be awarded only where proximate cause is shown.

These jury instructions permit consideration of evidence of claimed damages for the plaintiff's inability, presently and prospectively, to perform the usual activities of life, such as the basic mechanical bodily movements that accommodate walking, climbing stairs, feeding oneself, driving a car, etc.  These instructions also permit the jury to consider evidence of the plaintiff's inability to perform the usual activities of life that have actually provided distinct pleasure to this particular plaintiff, these being the so-called "hedonic" damages.

Pursuant to these instructions, the jury is to determine, from the evidence adduced, the amount of money that will reasonably compensate the plaintiff for the damage proximately caused by the negligence of the defendant.  In determining such

amount the jury may, among other elements, consider the plaintiff's ability or inability to perform his usual activities, basic and hedonic (Section 23.01[2]) and also may consider the claim that the physical disability will continue in the future (Section 23.01[3]) to prevent the plaintiff from performing his usual activities.

As reflected in Section 23.01 of OJI, juries in Ohio are already permitted to award damages for what generally has been referred to as "loss of enjoyment of life." Therefore, it is not necessary to create a new and additional element of damage here that would encompass this claimed loss and resulting damage.

Accordingly, in current practice, the plaintiff may adduce evidence concerning his inability, because of the injury, to perform certain activities that he had usually performed. The trial counsel may argue such element of damage to the jury, and the trial court shall give the quoted instruction, and those set forth hereinafter, to the jury. However, what is sought here goes beyond the giving of such jury instructions. It is appellees' position that the jury should be able to consider such alleged damage separate and apart from any damages for pain and suffering, and that the jury should be permitted to make a finding by way of answers to interrogatories and a verdict for such damages.

One of the elements of compensatory damages that is universally allowed in actions for personal injuries is the pain and suffering endured by the plaintiff as a result of the injury. In addition to compensation for the physical pain, the jury is permitted to award compensation for the mental suffering endured. See Smith v. Pittsburg[h] Fort Wayne & Chicago Ry. Co. (1872), 23 Ohio St. 10, 18-19; Flory v. New York Central RR. Co., supra.

In Black's Law Dictionary (6 Ed. 1990) 1109, we find that "pain and suffering" is a "[t]erm used to describe not only physical discomfort and distress but also mental and emotional trauma which are recoverable as elements of damage in torts. * * *"

Generally, pain and suffering has been viewed as a unitary concept. Accordingly, it was stated in Capelouto v. Kaiser Found. Hosps. (1972), 7 Cal.3d 889, 892-893, 103 Cal.Rptr. 856, 859, 500 P.2d 880, 883, that: "In general, courts have not attempted to draw distinctions between the elements of 'pain' on the one hand, and 'suffering' on the other; rather, the unitary concept of 'pain and suffering' has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (Footnote omitted.)

In Ohio, an action in tort may allege, and proof may be offered on both pain from physical injuries and suffering from mental or emotional disturbance. However, in Ohio there need not be a contemporaneous physical injury in order to allege damages for emotional distress. Schultz v. Barberton Glass Co. (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, syllabus; Paugh v. Hanks (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph two of the syllabus.

As noted, case law generally and repeatedly refers to "pain and suffering" as an element of damages that is recoverable in Ohio. However, it is interesting to note that OJI Section 23.01(2), in setting forth the elements that a jury may consider in awarding damages, does not refer to "suffering" but only to "the pain that was experienced." However, at Section 23.04, Mathematical Formula, OJI, does refer to "pain and suffering."

In answering the issue presented as to whether the damage elements of pain and suffering and diminishment or loss of life's enjoyment should be considered as separate and distinct elements, we look to the generally understood meaning and use of the particular terms "pain," "suffering" and "inability to perform usual activities." Physical pain is the neurological response to physical damage to the body, and has been defined as "'a more or less localized sensation of discomfort, distress or agony resulting from the stimulation of specialized nerve endings.'" Werchick, Unmeasurable Damages and a Yardstick (1965), 17 Hastings L.J. 263, 264, quoting Dorland's Medical Dictionary (24 Ed. 1965). "Suffering," in the sense of damages as we discuss here, may take a number of forms, and encompass a number of concepts. Generally, however, it may be viewed as a mental or emotional state brought on by the plaintiff's injury. Any definition of suffering, although not definitive, may include a broad range of emotional responses which may occur in conjunction with the trauma and resultant physical injury and pain, or irrespective of any physical injury and pain. The California Supreme Court has held that mental suffering "constitutes an aggravation of damages when it naturally ensues from the act complained of, and in this connection mental suffering includes nervousness, grief, anxiety, worry, shock, humiliation and indignity as well as physical pain." Crisci v. Security Ins. Co. of New Haven (1967), 66 Cal.2d 425, 433, 58 Cal.Rptr. 13, 18, 426 P.2d 173, 178. It may be quite readily discerned why the damage element of "pain" has been equated with "suffering," and unified into the damage element of "pain and suffering." This basically has been the practice and procedure in Ohio.

In a discussion of this area of the law, we find in the Comment, Loss of Enjoyment of Life as a Separate Element of Damages (1981), 12 Pac.L.J. 965, supra, the following:

"In conclusion, pain can be characterized broadly as physiological while suffering is more appropriately deemed psychological. Whereas pain refers to the physical sensations resulting from the corporeal injury, suffering is concerned primarily with the person's emotional reaction to these sensations. * * * [H]owever, neither pain nor suffering deals with the limitations on the person's life created by the injury." Id. at 972.

The damage with which we deal here is the claimed impairment of one's physical capacity to enjoy the amenities of life. This concept entails providing compensation for the deprivation of one's ability to engage in those activities, and perform those functions, which were part of, and provided pleasure to, one's life prior to the injury. This type of claimed damage is distinguishable from those types of damages that are based upon recognized categories of bodily pain and

mental suffering.  The claim of damages for deprivation or impairment of life's usual activities has, in other jurisdictions, been applied to a wide variety of pleasurable activities shown to have been curtailed by the injuries received by the plaintiff.  Such damages include loss of ability to play golf, dance, bowl, play musical instruments, engage in specific outdoor sports, along with other activities.  These types of experiences are all positive sensations of pleasure, the loss of which could provide a basis for an award of damages to the plaintiff in varying degrees depending upon his involvement, as shown by the evidence.  Such proof differs from the elements of mental suffering occasioned by the plaintiff's injury such as nervousness, grief, shock, anxiety, and so forth.  Although the loss of the ability to engage in a usual pleasant activity of life is an emotional experience, it is a loss of a positive experience rather than the infliction of a negative experience.

In a review and weighing of all factors involved in this discussion, we find it reasonable to treat the claimed inability to perform usual functions (both basic and hedonic) as a separate and distinct element of damage.  As noted previously, such an element of damages has already been reflected in OJI Section 23.01(2).  It would seem to follow that if Ohio has seen fit to provide for such a statement of law within its standard jury instructions, then the determination of such damage may be made by the jury separate from the other elements of allowable damage that it considers.

We believe that such a conclusion is reasonable based upon a number of factors.  First, we proceed upon the premise that the primary purpose for awarding damages in a personal injury action is to, as best that a jury award may do so, restore the plaintiff to the position occupied prior to the tortious act occasioning the injuries.  Giving Ohio's standard jury instructions, and permitting a separate interrogatory and jury finding on this damage, would help the jury understand exactly what claimed damages it is addressing.  This adds more clarity and objectivity to this part of the jury determination.

Further, we believe a very significant basis of our conclusion here is the importance of facilitating appellate review of jury damage awards.  With such separate findings by the jury being available, not only may counsel for the litigants more accurately determine the need for appeal, but the review process on appeal would be enhanced.

Accordingly, we conclude that although it may have been error on the part of the trial court to submit a special interrogatory on the overbroad element of damage known as "loss of enjoyment of life" rather than the focused element entitled "inability to perform usual activities," the error was not prejudicial, in that we herein specifically authorize the latter in accord with the language of OJI.

As noted previously, the many jurisdictions which have not permitted "loss of enjoyment of life" as a separate element of damages made their determination on the basis that this would lead to a duplication of damages, in that the jury would have included that loss within the element of pain and suffering or the permanency of the disability.  We recognize the validity of such fears, and with the aim of avoiding the feared

duplication, shall herewith set forth new provisions to Section 23.01 of OJI. Our intent is that the trial court shall henceforth instruct the jury that if it awards damages for loss of ability to perform usual activities (which will also encompass the permanency of the disability suffered), the jury must not award additional damages for that same loss when considering any other element of damages, such as physical and mental pain and suffering, as such additional award would be duplicative.

In the appropriate case, where there have been allegations of and evidence adduced on the plaintiff's inability to perform usual activities, occasioned by the injuries received, the trial court shall give these additional instructions to the jury:

"If you find from the greater weight of the evidence that, as a proximate cause of the injuries sustained, the plaintiff has suffered a permanent disability which is evidenced by way of the inability to perform the usual activities of life such as the basic mechanical body movements of walking, climbing stairs, feeding oneself, driving a car, etc., or by way of the inability to perform the plaintiff's usual specific activities which had given pleasure to this particular plaintiff, you may consider, and make a separate award for, such damages.

"Any amounts that you have determined will be awarded to the plaintiff for any element of damages shall not be considered again or added to any other element of damages. You shall be cautious in your consideration of the damages not to overlap or duplicate the amounts of your award which would result in double damages. For example, any amount of damages awarded to the plaintiff for pain and suffering must not be awarded again as an element of damages for the plaintiff's inability to perform usual activities. In like manner, any amount of damages awarded to the plaintiff for the inability to perform usual activities must not be considered again as an element of damages awarded for the plaintiff's pain and suffering, or any other element of damages."

### III

### Conclusion

Accordingly, for the foregoing reasons, the judgment of the court of appeals is reversed on the issue of the propriety of requiring the parties to submit to a videotape trial over their joint objection, and on the issue of the claimed damages for "loss of enjoyment of life." Upon retrial, after appropriate evidence has been adduced, the damage element of "loss of ability to perform the plaintiff's usual functions" may be considered by the jury pursuant to this opinion.

Judgment reversed
and cause remanded.

Moyer, C.J., Sweeney, Douglas, Wright, H. Brown and Resnick, JJ., concur.

FOOTNOTES:

1 The McCall trial was a civil tort case where only the extent of damages was in dispute. McCall was the first case in which all testimony was prerecorded and presented to a jury in a continuous sequence. The trial was conducted outside the presence of Judge McCrystal. However, he edited the videotape before trial in order to remove inadmissible evidence objected

to by counsel.  The attorneys were provided the opportunity, prior to trial, to discuss the judge's rulings on their objections.  Opening statements and, of course, voir dire were presented live.  Following closing arguments, the judge gave his instructions, via videotape, to the jury who then commenced deliberations.  See Staff Note, Civ.R. 40; and Kornblum, Videotape in Civil Cases (1972), 24 Hastings L.J. 9, 27.

2  These advantages include:

"(1) the trial flows without interruption from objections, bench conferences, delays for witnesses, counsel's pauses, client conferences and chamber retreats; (2) maximum utilization of juror time is achieved; (3) the time required for a given trial is shortened considerably; (4) the trial can be scheduled, with certainty, for a specific day; (5) the witnesses can be presented in the desired order, obviating the need for adjustment to availability at the last moment; (6) the chance of mistrial is greatly reduced; (7) there is no need to recess for the preparation of instructions; (8) directed verdict motions are decided when the tapes are previewed and do not infringe on courtroom time; (9) opening statements should be more effective with knowledge of precisely what the evidence will show; (10) the judge need not be present during the viewing of the tape, freeing him for other duties; (11) the presence of the lawyers is not required during the viewing of the tape; (12) it is possible for judge and counsel to conduct simultaneous trials; (13) trial preparation can be more effectively scheduled and the taping may be in the most convenient order of witness availability; (14) last-minute preparation is eliminated; (15) time is afforded for study of evidentiary questions; (16) testimony on location is facilitated; (17) elimination of live trial impediments gives the jury a comprehensive related view of the entirety of the case; (18) the tape can serve as the transcript of proceedings on appeal; (19) retrial is facilitated; (20) extrajudicial judge influence through reaction to witnesses and comments to counsel is reduced; (21) the court need no longer resort to the fiction that a juror can disregard what he has heard in accordance with the judge's instructions."  McCrystal & Young, Pre-Recorded Videotape Trials - An Ohio Innovation, supra, 39 Brooklyn L.Rev. at 563-564.  See, also, McCrystal & Maschari, Will Electronic Technology Take the Witness Stand? (1980), 11 U.Tol.L.Rev. 239.

3  In Doret, Trial by Videotape -- Can Justice be Seen to be Done? (1974), 47 Temp.L.Q. 228, 241, it is suggested that videotape has its effect on the information offered to the jury in a number of ways:

"There will be: (1) a loss of the completeness in the information communicated, (2) an electronic distortion of the information communicated, (3) a limiting in the information carrying capacity of the trial, (4) perceptual distortions in the information communicated, (5) a loss in the veracity of the information communicated and (6) an innate biasing of the information communicated."

In this article the delicate thread of communication between witness and jury was aptly described:

"Testimony is a process of communication between witness and jury.  Although the jury is normally silent, the process is

decidedly not a one-way communication since the reactions of members of the jury tell the witness a great deal about the impression he, and his testimony, are making.  If we view the process of giving testimony as a communications 'system,' it is clear that the trial provides the witness with a built-in 'feedback' mechanism.  Videotape, however, by allowing the separation of the witness from the jury's presence, eliminates the opportunity to receive this feedback."  (Footnotes omitted.)  Id. at 250.

Another specific concern about the use of videotape trials is that a greater potential may exist during a videotape trial than in a conventional trial for a witness to falsify his or her testimony given the detachment of the jury from the witness.  Id. at 244.  A live trial as opposed to a videotape trial has all the essential participants convened in the courtroom, the parties confront each other, and the jury is present along with the general public.  This "charged" atmosphere may elicit truthtelling and expose falsehood.

4  Although the constitutionality of Civ.R. 40 and C.P.Sup.R. 12(B) is not challenged in these proceedings, we must still determine whether the litigants' rights were violated by the trial judge's apparent failure to take into account the costs involved, the nature of the action and the nature and amount of testimony.

5  We will not address the constitutionality of Civ. R. 40 or C.P.Sup.R. 12(B) since they have not been challenged and there are alternative procedural grounds on which to deal with the issues before us.  See State ex rel. Lieux v. Westlake (1951), 154 Ohio St. 412, 43 O.O. 343, 96 N.E.2d 414, paragraph one of the syllabus ("[c]onstitutional questions will not be decided until the necessity for their decision arises").

6  C.P.Sup.R. 12(B)(2) contains both the words "shall" and "may" in succeeding sentences.  As a general rule of statutory construction, when "shall" and "may" are used in close juxtaposition there is a presumption that they are to be given their ordinary meaning.  See, generally, Wachendorf v. Shaver (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E. 370, paragraph five of the syllabus.