BAILEY, Appellant,

v.

ALLBERRY, Admr., Appellee.

[Cite as *Bailey v. Allberry* (1993), 88 Ohio App.3d 432.]

Court of Appeals of Ohio,
Montgomery County.

No. 13558.

Decided June 30, 1993.

*Pickrel, Schaeffer & Ebeling* and *James W. Kelleher,* for appellant.

*Baden & Jones Co., L.P.A.,* and *Thomas P. Erven,* for appellee.

---

BROGAN, Judge.

Lonnie Bailey appeals from the jury verdict awarding him $25,500 for personal injuries received in a car accident and from the judgment of the Montgomery County Court of Common Pleas overruling his motion for additur or a new trial.

The facts of this case are as follows. On November 12, 1988, Lonnie Bailey was the passenger in a vehicle driven by David C. Brackett. Bailey and Brackett were returning home from Broadway Sand and Gravel where they both worked in heavy construction.

On that day, it was overcast and the roads were damp from previous rainfall. While driving down a hill on Route 725, Brackett apparently encountered a sudden heavy rainstorm and lost control of his car. The car drifted left of center and collided with a van. Brackett was driving approximately fifty m.p.h. in a thirty-five m.p.h. zone and did not slow down prior to the collision. Brackett died as a result of injuries sustained in the collision. Bailey was ejected from the car's T-top roof and suffered two fractured cervical vertebrae and a cerebral concussion. It is undisputed that Bailey's injuries were a result of the collision and that he had no neck complaints or injuries prior to the accident.

On November 8, 1990, Bailey filed a complaint against Charles Allberry, administrator of Brackett's estate, seeking compensatory damages and reimbursement for medical bills and lost wages resulting from the personal injuries he sustained in the collision. The administrator of the estate filed an answer on January 9, 1991. Bailey filed two amendments to his complaint to increase the amount of damages sought.

On December 23, 1991, Bailey filed a motion for summary judgment solely upon the issue of liability, which was overruled on January 24, 1992.

A jury trial was held from February 3, 1992 to February 7, 1992. The jury awarded Bailey damages in the amount of $25,500. The jury interrogatories revealed that this award included:

$16,349 for past medical expenses.

$ 7,315 for lost wages.

$ 1,836 for pain and suffering to the time of trial.

$ 0 for pain, suffering and impairment in the future.

$ 0 for future lost wages due to retraining.

$ 0 for future expenses for vocational retraining.

The judgment entry was filed on April 6, 1992.

On April 20, 1992, Bailey filed a motion for new trial or additur on the issue of damages. The trial court overruled this motion on June 23, 1992.

On July 17, 1992, Bailey filed a notice of appeal from the trial court's judgment overruling his motion for additur or a new trial and the final entry and order of judgment filed on April 6, 1992.

Bailey advances three assignments of error: (1) the jury erred in awarding inadequate damages when it disregarded the uncontroverted medical and lay evidence on damages and the trial court erred in failing to grant a new trial on the issue of damages; (2) the trial court erred in failing to supervise and correct the erroneous jury verdict by an additur and the court of appeals should exercise its *de novo* duty to correct the verdict by ordering an additur; and (3) the trial court erred in striking Exhibit F from plaintiff's motion for new trial or additur.

In his first assignment of error, Bailey presents two arguments: (1) that the jury erred in awarding inadequate damages when it disregarded the uncontroverted medical and lay evidence on damages, and (2) that the trial court erred in failing to grant a new trial on the issue of damages. We will address each of the arguments in turn.

With respect to his first argument, Bailey asserts that (1) the jury failed to consider an element of damages supported by uncontroverted expert testimony by the defense and treating physicians; (2) the verdict appeared to have been given under the influence of passion and prejudice; and (3) the judgment was not sustained by the weight of the evidence.

"The purpose of a civil trial is to fully compensate the injured party for his losses." See *Miller v. Irvin* (1988), 49 Ohio App.3d 96, 550 N.E.2d 501.

"Compensatory damages are intended to make whole the plaintiff for the wrong done to him * * * by the defendant." *Fantozzi v. Sandusky Cement Prod. Co.* (1992), 64 Ohio St.3d 601, 612, 597 N.E.2d 474, 482. Compensatory damages measure actual loss, and allow recovery for direct pecuniary losses resulting from an injury such as medical expenses, loss of time or money, *"loss due to the permanency of the injuries, disabilities or disfigurement, and*

*physical and mental pain and suffering."* (Emphasis added). *Id.* at 612, 597 N.E.2d at 482.

This court has previously held that in order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness, *cannot be reconciled with the undisputed evidence in the case,* or *is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim.* *Sharp v. Clark* (May 20, 1992), Darke App. No. 1285, unreported, 1992 WL 107849, citing *Sherer v. Smith* (1949), 85 Ohio App. 317, 322–323, 40 O.O. 210, 212, 88 N.E.2d 426, 428–429 (citing *Toledo Rys. & Light Co. v. Mason* [1910], 81 Ohio St. 463, 91 N.E. 292).

■ The record shows that Bailey was hospitalized for ten days after the collision, at which time he was first examined and treated by neurosurgeon Dr. Lynn Robbins for two neck fractures at the C–2 and C–7 vertebrae and a cerebral concussion.

To stabilize the fractures, Bailey was first placed in the Gardner–Wells tongs traction system. The tongs are similar to a clamp with sharp hinges which are screwed into the skull with twenty-five pounds of pressure per square inch.

After wearing the Gardner–Wells tongs for four or five days, Bailey was fitted with a halo vest, which immobilizes the neck by way of a halo-like ring that is screwed into the skull with four pins and then hooked by bars to a vest. Bailey stated that fitting the halo, even with anesthetic, is a painful process. Bailey testified that the pain was very intense.

Bailey wore the halo vest for sixty-seven days, until January 24, 1989. Afterwards, Bailey wore a hard styrofoam collar and thereafter a soft foam rubber collar on an "as needed" basis to give his neck mild support.

Bailey was given pain medication while at the hospital, but refused further medication while recuperating at his home due to his fear of drug dependency. Bailey stated this fear stemmed from witnessing his disabled father become addicted to prescribed pain medication and the resulting familial problems.

On September 17, 1989, Bailey underwent plastic surgery to improve the two wide, depressed scars left on his forehead from the screws used to stabilize the halo vest. His plastic surgeon, Dr. Thomas Percy, stated that the facial scars and indentations in Bailey's forehead remaining after the surgery would be permanent. Bailey stated that even after the surgery the scars were noticeable to him and to others.

Bailey's fractures healed well, although an X-ray taken on October 12, 1990 revealed that the C–7 vertebra was somewhat deformed. Dr. Robbins allowed Bailey to return to work with restrictions as to lifting on April 7, 1989.

Bailey testified that three years after the accident he continues to experience constant pain in his neck, which increases depending on the activity engaged in at the time. Bailey stated he could sometimes relieve the pressure-like pain by twisting his neck and popping it, which he does three to seven times per day.

The testimonies of Dr. Robbins and Dr. Kramer, the neurosurgeon for the defense, differed as to Bailey's long-term prognosis.

Dr. Robbins stated that Bailey's chronic neck pain was permanent, and that the injured area would develop post-traumatic arthritis sometime in the future. He further stated that due to the nature of heavy construction work, there would come a time when Bailey could no longer work in heavy construction and would therefore need to be retrained. Additionally, Bailey's daily activities would need to be limited to low impact or no impact sports, eliminating such sports as football, basketball, and skiing to reduce any potential "wear and tear" on his joints.

Dr. Kramer, on the other hand, testified that Bailey should be able to continue working in construction. However, Dr. Kramer, admitted that his diagnosis was based on one examination of Bailey in which the details of Bailey's duties as a heavy equipment operator were not discussed. Kramer further stated that his opinion was based on what other patients involved in heavy construction had told him regarding their duties.

Dr. Kramer opined that Bailey's complaints of cracking, popping, pressure, and aching in his neck lacked credibility, were "subjective," and were not substantiated by the fact that Bailey did not find it necessary to take pain medication. However, Kramer did admit that a person with a high pain threshold might be less likely to use medications.

Dr. Kramer found Bailey to have chronic neck pain on the date of examination and stated that he was unsure as to the permanency of the condition. Dr. Kramer further opined that he did not believe Bailey would experience post-traumatic arthritis in the future because he had not observed traumatic arthritis develop in other patients at the C–2 vertebral body level.

Contradictory testimony was elicited from the vocational counselors with respect to Bailey's continued ability to work in construction. Kenneth Manges, Ph.D., a psychologist and vocational evaluator and counselor, testified that based upon his reading of Dr. Robbins's deposition, he believed that Bailey's ability to perform his present work in heavy construction was diminished. He further stated that should Bailey return to school, the physical discomfort in his neck

would limit his learning capacity and that retraining should begin as soon as possible. Last, he stated that Bailey had a mild condition of post-traumatic stress disorder which could continue into the future.

However, Harold Silverman, Ed.D., designated as an expert as a psychologist and a vocational expert, testified that he did not know whether Bailey's injuries would preclude him from working in construction in the future, and that Bailey would not need rehabilitation or retraining in the future unless there was a change in his medical, environmental, and psychological situation. Dr. Silverman further stated that his opinion concerning Bailey's ability to continue working was based on the fact that Bailey was currently working and did not consider whether Bailey was experiencing work-related neck pain. However, he added that if the jarring and vibration associated with heavy construction would cause Bailey problems, vocational counseling and guidance would be recommended.

We find that the jury's verdict, in light of this evidence as to Bailey's pain and suffering at the time of trial, and his probable pain, suffering and impairment in the future, is so disproportionate as to shock reasonable sensibilities and indicates that the jury lost its way in assessing compensatory damages. See *Spicer v. Armco Steel Corp.* (1974), 68 O.O.2d 314, 322 N.E.2d 279; *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 257, 598 N.E.2d 1174, 1181.

Thus, the evidence is undisputed that Bailey was hospitalized for ten days, wore the halo device for sixty-seven days, missed five months of work, experienced a reduced activity level, was left with facial scars, and is still suffering from chronic neck pain. For the pain and suffering resulting from these experiences, the jury awarded Bailey $1,836. We find that this award cannot be reconciled with the undisputed evidence in this case and/or is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim.

Inasmuch as we find that the jury's verdict was inadequate, we next turn to Bailey's contention that the trial court erred in failing to grant his motion for a new trial or additur.

"When [a] trial has resulted in an award to the injured party so inadequate as to deny him the justice that he deserves, the court should grant a new trial." *Miller, supra,* 49 Ohio App.3d at 98, 550 N.E.2d at 503. However, a trial court's denial of a motion for a new trial can only be reversed if the trial court abused its discretion. *Yungwirth v. McAvoy* (1972), 32 Ohio St.2d 285, 61 O.O.2d 504, 291 N.E.2d 739. An abuse of discretion in this context implies an unreasonable, arbitrary, or unconscionable attitude upon the part of the court. *Poske v. Mergl* (1959), 169 Ohio St. 70, 8 O.O.2d 36, 157 N.E.2d 344; *Jeanne, supra,* 74 Ohio App.3d at 257, 598 N.E.2d at 1181.

"In assessing whether a trial court has abused its discretion under Civ.R. 59(A)(4), a reviewing court should consider the amount of the verdict, whether the jury considered incompetent evidence, improper argument by counsel or other improper conduct which can be said to have influenced the jury." (Citations omitted.) *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 773–774, 596 N.E.2d 500, 504, jurisdictional motion overruled (1991), 61 Ohio St.3d 1422, 574 N.E.2d 1092. See, also, *Slivka v. C.W. Transport, Inc.* (1988), 49 Ohio App.3d 79, 80, 550 N.E.2d 196, 197–198; *Fromson & Davis Co. v. Reider* (1934), 127 Ohio St. 564, 569, 189 N.E. 851, 853.

■ We find that the trial court improperly considered the evidence presented in denying Bailey's motion for a new trial or additur.

The trial court cited the following reasons for overruling Bailey's motion:

"Given the close friendship of the parties, the death of the defendant's decedent, the nature of the accident, the quick recovery of the plaintiff, and the often contradictory evidence concerning both the nature and extent of the plaintiff's injuries, the plaintiff has not sustained his burden of establishing the jury's verdict to be a result of passion or prejudice. Accordingly, the plaintiff's motion for a new trial pursuant to Ohio Rule of Civil Procedure 59(A)(4) must be denied."

With respect to past pain and suffering, the trial court found the jury's award of $1,836 reasonable in light of the evidence that (1) the halo device allowed Bailey to move around and be relatively comfortable; (2) Bailey had no pain, numbness, weakness or paralysis just one month after the accident; (3) Bailey returned to work within five months after the accident; (4) Bailey reported no pain during a regular visit to his primary treating physician; (5) Dr. Kramer noted Bailey was not taking pain medication and believed that that indicated that Bailey was not experiencing significant pain; and (6) Bailey enjoyed a quick recovery.

With respect to future pain and suffering, the trial court noted that (1) Bailey has returned to work and missed no work because of his injury; (2) Bailey has no limit to his range of motion; (3) Bailey is not taking any continuing medication; (4) Bailey could still play basketball and softball, although not to the same extent as before the accident; (5) Dr. Kramer noted Bailey's complaint of "neck popping" to be subjective and further detailed the lack of pain medication as an objective manifestation to support his complaints; (6) Dr. Kramer testified that he could not be sure the injuries would be permanent; (7) Dr. Robbins acknowledged "the lack of objective manifestations in support of Bailey's claim"; and (8) "Plaintiff's expert physician was unable to exclude the possibility that Plaintiff's

employment could have caused and/or contributed to what he felt to be Plaintiff's permanent condition."

We find that some of the trial court's findings, while taken from the trial transcript, have been taken out of the context in which they were stated.

First, the trial court found that the halo device allowed Bailey to move around and be relatively comfortable. The record shows that Dr. Robbins stated that the vest essentially immobilizes persons—they can eat, but their head cannot go up and down. Dr. Robbins further stated that there is pain and discomfort to the patient accompanying insertion of the vest, which can continue for up to ten days, until the patient becomes accustomed to having screws in his or her head. With respect to relative comfort, Dr. Robbins's testimony was as follows:

"Q. Are adjustments required to this halo device during the hospitalization?

"A. Generally the screws have to be retorqued or tightened, and then the halo may have to be adjusted in different ways *so that it is tolerable, so the person can get up and get around and walk and be relatively comfortable.* [Emphasis added.]

"* * *

"Q. What restrictions or limitations would a person such as Lonnie have in normal daily activities while wearing this type of a traction device?

"A. Primarily all you could do is *just get up around, walk around, eat, that is about all you could do.* You can move your arms and legs but you couldn't, you know, work, do things such as that, you can't drive. You would be very restricted on any places you can go." (Emphasis added.)

Additionally, testimony from Bailey's mother revealed that during the time he wore the halo device, "she basically [did] everything for him; he needed help bathing and washing his hair, and additionally had difficulty sleeping."

The trial court stated that Bailey had no pain, numbness, weakness or paralysis just one month after the accident. While Dr. Robbins did indeed state that his records so indicated, he explained that on August 25, 1989, his notes of "essentially no pain" indicated Bailey was not experiencing any serious problem with pain, but that did not mean Bailey was not experiencing any pain at all:

"Q. Does your customary practice in recording notes reflect then by that entry that Lonnie Bailey would have been having some reports of pain in August of '89 by the way you wrote your office notes?

"A. If a person were having some discomfort now and then, a mild problem, it probably wouldn't be entered in here because usually after fractures we are looking for a pretty significant thing, so just because it says essentially no pain, it certainly means he wasn't having any serious pain of any kind which we, you

know, do a lot more testing for. That does not mean nor could you interpret that to definitely mean he was having discomfort, because it just isn't documented to be honest."

Thus, the statement that Bailey had no pain, numbness, weakness or paralysis one month after the accident is not an accurate assessment of Bailey's condition at that time.

The trial court also noted that Bailey was not taking pain medication, and accepted Dr. Kramer's statement that Bailey was not experiencing significant pain.

The evidence is clear that Bailey refused pain medication upon leaving the hospital, which he explained was due to his fear of becoming addicted to the prescription drugs, as had his father, combined with his high tolerance for pain.

The evidence is also clear that Dr. Kramer admitted that a patient with a high tolerance for pain would be less likely to need pain medication. Testimony concerning Bailey's high tolerance for pain was undisputed.

Next, the trial court noted that Bailey could still play basketball and softball, although not to the same extent as before the accident. Thus, even three years after the accident, Bailey was still limited as to the level he was able to participate in pre-accident activities. However, Bailey was assessed $0 damages for future pain and suffering.

The trial court further stated that Dr. Robbins was unable to exclude the possibility that Bailey's employment could have caused and/or contributed to what he felt to be plaintiff's permanent condition, referring to Dr. Robbins's testimony. That testimony read as follows:

"Q. Do you have an opinion, Doctor, within reasonable medical certainties, as to whether Lonnie Bailey will develop post-traumatic arthritis in his neck as a result of the fractures at C2 and C7 sometime in the future?

"A. I think that he will have some premature aging of his neck because of the fractures.

"Q. What is the basis of your opinion.

"A. That he has already had trauma to the neck and even though it is healed up, it isn't like being brand new, that is it is not the same as if he had never had an injury to it.

"Q. Doctor, do you have an opinion and recommendation within reasonable medical certainties as to whether Lonnie Bailey will be able to indefinitely continue working at his job as a heavy equipment operator, considering his present condition and your opinion regarding his future medical condition.

"A. Because of the jarring and the nature of working in heavy construction with heavy equipment, and the fact that he describes that his neck pain worsens when he does this kind of work, I think there will come a time when he cannot do that kind of work."

Dr. Robbins further testified as follows:

"Q. Doctor, would you say that doing [*sic*] heavy equipment operator is when you are being bumped and jiggled and jarred and generally vibrated, does that generally cause wear and tear on the joints more than let's say a person that is more sedentary in their work, like a lawyer?

"A. It is difficult to answer the question. *You would think that it certainly might do that but I don't have any, you know, data that would indicate that.*

"Q. But you do know, Doctor, as a neurosurgeon, to a reasonable medical certainty, that the more you use these various joints on your body, including these joints in the cervical neck, that the more probability there is that you are going to have wear and tear on the joints?

"A. I would agree.

"Q. Yes, and that in this instance, Mr. Bailey has had this trauma to this area of his neck?

"A. Correct.

"Q. And he is superimposing upon that trauma certain, his normal work style, which is the jarring and motion of the normal wear and tear that he had?

"A. That's correct.

"Q. And I think what you have indicated is that you are not quite aware as to when his neck is going to wear out?

"A. That is true.

"Q. Generally?

"A. Uh-huh.

"Q. With or without this trauma that he has had?

"A. Uh-huh." (Emphasis added.)

Thus, Dr. Robbins's testimony does not indicate that Bailey's work in construction caused or contributed to his permanent condition, only that continued work in this field could cause his neck joints to wear out faster.

In sum, we conclude that the jury lost its way in assessing damages for pain and suffering up to the date of trial, and for future pain and suffering with respect to the chronic neck pain which the record shows continues to plague

Bailey. Therefore, a new trial on the issue of damages is appropriate under these circumstances. Bailey's first assignment of error is sustained.

In his second assignment of error, Bailey asserts that the trial court erred in failing to supervise and correct the erroneous jury verdict by an additur and the court of appeals should exercise its *de novo* duty to correct the verdict by ordering an additur.

Due to our disposition of Bailey's first assignment of error, the issue in this assignment of error has been rendered moot.

Bailey asserts in his third assignment of error that the trial court erred in striking Exhibit F from his motion for new trial or additur. Exhibit F contained two letters from counsel reflecting their last settlement position.

Bailey argues that Evid.R. 408 does not require exclusion of offers to compromise when the offers are proposed for other purposes. Bailey contends that these letters were presented as information to consider with the totality of the evidence in determining whether the judgment was insufficient and the amount of additur. See *Bartlebaugh v. Pennsylvania Rd. Co.* (1948), 150 Ohio St. 387, 38 O.O. 237, 82 N.E.2d 853.

We find that based on our disposition of Bailey's first assignment of error ordering a new trial on damages rather than an additur, this assignment of error is also moot.

The judgment of the Montgomery County Court of Common Pleas is affirmed on the issue of liability, but is reversed and remanded for a new trial on the issue of damages.

*Judgment accordingly.*

GRADY, P.J., and FREDERICK N. YOUNG, J., concur.