OPINION
{¶ 1} Plaintiffs-appellants appeal from the judgment of the Franklin County Court of Common Pleas entered upon a jury verdict awarding damages to plaintiffs against defendant-appellee Joseph L. Racan, Jr. ("Racan"), and against defendant-appellee Miranda Renee Edel ("Edel").
 {¶ 2} On March 14, 2000, plaintiffs Lisa A. Sotos, aka Lisa A. Collins ("Lisa"), Lisa's husband, Andrew D. Collins ("Andrew"), and their minor child, Jeremy R. Collins ("Jeremy"), filed suit in the Franklin County Court of Common Pleas. Plaintiffs asserted claims for negligence and loss of consortium against Edel arising from an automobile accident occurring March 17, 1998. In addition, plaintiffs sought underinsured/uninsured motorist coverage from defendant Nationwide Insurance Company ("Nationwide"). Because Edel failed to answer the complaint, plaintiffs moved for default judgment. On August 4, 2000, the trial court, by entry, ruled that Edel was in default and referred the matter to a magistrate for a damages hearing. Nationwide answered the complaint but was ultimately dismissed from the action.
 {¶ 3} On November 9, 2000, the trial court granted plaintiffs leave to amend their complaint and to add Racan as a new-party defendant. Plaintiffs amended their complaint to assert claims for negligence and loss of consortium against Racan arising from an automobile accident occurring May 29, 1997. Racan answered the amended complaint on January 9, 2001.
 {¶ 4} The action against Racan and Edel came on for trial by jury in July 2002. The jury rendered a verdict on July 12, 2002, and also answered interrogatories.
 {¶ 5} Against Racan, involving the first accident, the jury awarded Lisa compensatory damages in the total amount of $18,951.10. The jury awarded no damages to Jeremy against Racan.
 {¶ 6} Against Edel, involving the second accident, the jury awarded Lisa compensatory damages in the total amount of $129,916.22, and awarded Jeremy $15,000 for loss of his mother's comfort, affection, guidance, and counsel.
 {¶ 7} On July 16, 2002, plaintiffs moved for "Additur 
Proper Determination of Damages." In the alternative, plaintiffs moved for a new trial. On August 23, 2002, the trial court denied these motions by entry.
 {¶ 8} On October 24, 2002, the trial court entered judgment on the jury verdict rendered July 12, 2002. Only the plaintiffs appealed from the judgment to the Franklin County Court of Appeals.
 {¶ 9} Lisa was injured in successive automobile accidents occurring respectively on May 29, 1997, and March 17, 1998.
 {¶ 10} On May 29, 1997, Lisa was 37 years of age and employed as a trial attorney at the office of the Ohio Attorney General where she had been working for several years at the downtown office in Columbus, Ohio. On that date, Lisa picked up Jeremy from daycare after work. Jeremy was not quite one year old on that day.
 {¶ 11} Lisa, Andrew, and Jeremy resided in the northwest area of Columbus. Lisa proceeded to drive home with Jeremy secured in the backseat of Lisa's Ford Escort. Heading east on Bethel Road, Lisa stopped at a red light at the intersection of Bethel and Godown roads. At that time, Racan was also heading east behind Lisa on Bethel Road in his Nissan Maxima. Racan stopped at the red light behind Lisa. As Lisa proceeded to make a right turn, Racan negligently collided his vehicle into the rear end of Lisa's vehicle. Racan's vehicle was moving under five m.p.h. when it struck Lisa's vehicle. There was very minor damage to the vehicles. Racan exited his vehicle and asked Lisa if she was alright. Lisa told Racan that she was fine. Upon Racan's suggestion, Racan and Lisa moved their vehicles to a nearby gas station. Lisa was concerned because Jeremy was crying so Racan called 911.
 {¶ 12} A police officer and a fire department medical squad arrived at the scene in response to Racan's call.
 {¶ 13} Lisa called Andrew at home. Andrew arrived at the accident scene while the medical squad was there. Jeremy was still secured in the vehicle and was crying. The medical squad kept Jeremy secured in the vehicle until they could determine whether he was injured. Then Andrew got Jeremy out of the car and calmed him down.
 {¶ 14} Later that evening, Andrew drove Lisa to a hospital emergency room because Lisa was complaining of pain. She was examined at the emergency room and released that evening. The emergency room physician reported his impression as "cervical mid back to low back strain, status post motor vehicle accident."
 {¶ 15} Lisa's automobile accident occurred on a Thursday. She missed work the next day but returned to full-time work the following Monday, June 2, 1997, at the Attorney General's office.
 {¶ 16} The following Friday, June 6, Lisa experienced some dizzy spells while at work. That evening, she returned to the emergency room complaining of continuing neck pain. The impression of the emergency room physician was "acute cervical strain, continued pain." The emergency room physician recommended that Lisa follow-up with Michael J. Meagler, M.D., a neurologist.
 {¶ 17} Lisa initially met with Dr. Meagler on June 9, 1997, and began treatment with him. Dr. Meagler referred Lisa to George W. Waylonis, M.D., for a consultation. Dr. Waylonis examined Lisa one time on September 22, 1997, and rendered a report of his findings. Dr. Waylonis is board certified in the specialty area of Physical Medicine and Rehabilitation and is a clinical professor of physical medicine at The Ohio State University. He has published extensively on the subject of fibromyalgia. He consults with other physicians regularly in that area.
 {¶ 18} According to Dr. Waylonis, fibromyalgia is a chronic disorder that results in pain in the muscles and soft tissues of the body. The symptoms of fibromyalgia may begin with a traumatic event such as an automobile accident, but can develop spontaneously. Approximately three to seven percent of the population are predisposed to the condition. Most who develop fibromyalgia do so before the age of 38. Moreover, the relative severity of the automobile accident is not an issue. Fibromyalgia can be induced by major or minor trauma.
 {¶ 19} In addition to muscle pain, other symptoms of fibromyalgia include stiffness, fatigue, headaches, and sleep disturbance. To determine whether a patient has fibromyalgia, Dr. Waylonis uses the criteria established by the American College of Rheumatology.
 {¶ 20} That criteria includes a history of widespread pain lasting for more than three months and the presence of at least 11 of 18 tender points at specific locations of the body. The presence of a tender point is determined by the physician's digital palpation of the area.
 {¶ 21} Once fibromyalgia develops, it is a lifelong condition. However, it is treatable with exercise, medications, and education. While the symptoms are chronic, they can vary in intensity from day to day.
 {¶ 22} Based on his September 22, 1997 examination, Dr. Waylonis opined in his written report of that date that Lisa did not have fibromyalgia based upon the absence of sufficient tender points in the standard 18 locations. However, on September 22, 1997, Dr. Waylonis did diagnose "Post traumatic cervical thoracic strain syndrome with localized post traumatic myofascial pain." (Waylonis Depo., at 27.) Dr. Waylonis also opined in his report that he believed Lisa's "prognosis is favorable for full recovery." (Depo. 28.)
 {¶ 23} During his deposition which was read to the jury, Dr. Waylonis noted the difference between myofascial pain and the pain associated with fibromyalgia. Myofascial pain "is a very limited restricted form [of] muscular pain" that "has a good chance to go away." (Depo. 32.) Dr. Waylonis testified that "many myofascial pain patients will eventually become fibromyalgia patients." (Depo. 33.) However, "there's no hard research on what percentage of people that show up with limited myofascial pain will go on to develop fibromyalgia." (Depo. 36.)
 {¶ 24} The fibromyalgic is not necessarily disabled from working, even full-time. Dr. Waylonis himself is an example of that point. Dr. Waylonis became symptomatic in his early 20's and has lived with fibromyalgia for over 40 years.
 {¶ 25} In late December 1997, Lisa began treatment with Kevin J. Anderson, M.D., as her primary care physician. In his initial office note, Dr. Anderson recorded that Lisa was involved in an automobile accident on May 29, 1997, and that she initially suffered significant neck and low back pain and has undergone physical therapy for the past four months. On her first visit, Lisa complained of having severe pain in her left lower neck with some radiation down into her shoulder. She reported to Dr. Anderson that she had been working out with weights, doing floor exercises, and swimming per instructions without relief. On the first visit, Dr. Anderson recommended that Lisa stop weight lifting but continue stretching exercises and swimming.
 {¶ 26} In his March 13, 1998 office note, Dr. Anderson gave his diagnosis as "post-traumatic myofascial pain syndrome." Dr. Anderson reiterated this diagnosis during his deposition. (Anderson Depo., at 16.)
 {¶ 27} In his deposition which was read to the jury, Dr. Anderson testified that, when he first saw Lisa in late December 1997, she "was working on a daily basis" and "had been recovering fairly well." (Depo. 16.) He also testified that Lisa was improving during the time that he first saw her until the second automobile accident.
 {¶ 28} Lisa's second automobile accident occurred on the morning of March 17, 1998 as Andrew was driving Lisa to work. Andrew and Lisa were stopped at a red light heading southbound on High Street when Edel, who was also driving southbound on High Street, drove her vehicle into the vehicle being driven by Andrew. Andrew testified that Edel's vehicle was moving about 30 m.p.h. at impact and that Edel did not apply her brakes prior to the collision. The emergency squad was called, and Lisa was transported to the emergency room at Riverside Hospital.
 {¶ 29} Lisa never returned to work after the March 17, 1998 accident.
 {¶ 30} At Riverside Hospital, Lisa underwent a series of spinal x-rays. There was no evidence of fracture or dislocation. She was kept under observation and then released. She was prescribed Percocet for pain.
 {¶ 31} On March 30, 1998, 13 days after her second accident, Lisa saw Dr. Anderson. They discussed a three-month period of disability to allow Lisa time to achieve some improvement. Dr. Anderson filled out the disability forms for her. After Lisa's second accident, Dr. Anderson prescribed narcotic medication for acute pain. He had not prescribed narcotics prior to the second accident. Percocet and Oxycontin were the narcotic medications that Dr. Anderson prescribed for pain. Lisa's functionality worsened under the narcotic medications. At one point, Lisa became "bedridden." (Depo. 51.)
 {¶ 32} According to Dr. Anderson, after the second accident, Lisa had a significant worsening of her pain and a significant worsening of her ability to function at home. In addition, Lisa began experiencing cognitive problems such as memory difficulties.
 {¶ 33} On September 8, 1998, Lisa first saw William S. Pease, M.D., upon being referred by Dr. Anderson. Dr. Pease is board certified in physical medicine and rehabilitation. He is also chairperson and associate professor of the Department of Physical Medicine 
Rehabilitation at The Ohio State University.
 {¶ 34} Initially, Dr. Pease concluded that Lisa did not have fibromyalgia. Dr. Pease's initial diagnosis was that Lisa had "multiple muscle strains and injuries related to the accidents." (Tr. 154.) Dr. Pease initially felt that the injuries were "localized" and that Lisa did not have fibromyalgia. (Tr. 154.)
 {¶ 35} However, in November 1998, some eight months after the second accident, Dr. Pease diagnosed fibromyalgia using the same criteria that Dr. Waylonis had used, i.e., the criteria established by the American College of Rheumatology.
 {¶ 36} Dr. Pease opined to a reasonable degree of medical certainty that Lisa will never be able to return to work as a trial lawyer due to her fibromyalgia. Dr. Pease opined to a reasonable degree of medical certainty that both automobile accidents "contributed" to Lisa's fibromyalgia. (Tr. 191.) Dr. Pease further testified that he could not allocate by percentages the respective contributions of the two accidents to Lisa's fibromyalgia.
 {¶ 37} During direct examination by plaintiffs' counsel, the following exchange occurred:
Q. [Plaintiffs' counsel:] * * * If the second accident had never occurred, in your opinion, would Lisa Sotos still have fibromyalgia today?
A. [Dr. Pease:] It's entirely reasonable to think that she would still have the fibromyalgia today if the second accident had never occurred, yes.
Q. [Plaintiffs' counsel:] What's your basis for that opinion?
A. [Dr. Pease:] My basis for my opinion is that this developed well after either accident. It's impossible to decide which of the two accidents actually triggered the fibromyalgia. * * *
(Tr. 194.)
 {¶ 38} During cross-examination by Racan's counsel, Dr. Pease testified:
Q. [Racan's counsel:] And it was after the second accident, was it not, that Ms. Sotos told you that that accident caused a complete physical and mental breakdown, is that correct?
A. [Dr. Pease:] She reported depressive-type features as I recorded it, and I used the phrase physical and mental breakdown. I assume that's something close to what she told me, yes.
Q. [Racan's counsel:] None of that had been described to you before the accident of March 1998, had it?
A. [Dr. Pease:] She described being in a great deal of pain, and multiple physicians' visits and visits to emergency rooms before the second accident.
Q. [Racan's counsel:] She did not describe her condition to you as a complete physical and mental breakdown, though, did she?
A. [Dr. Pease:] That is correct, this is a change.
(Tr. 210-211.)
 {¶ 39} On this appeal, plaintiffs present four assignments of error as follows:
I. The trial court erred as a matter of law in failing to instruct the jury that the two individual defendants were jointly and severally liable, thus requiring the defendants to prove apportionment of damages.
II. The trial court erred as a matter of law when it failed to make an independent determination as to the proper amount of damages related to defendant edel's conduct.
III. The trial court erred by failing to grant plaintiff's [sic] motion for a new trial on the jury's verdict award of damages related to appellee racan's conduct, which was against the manifest weight of the evidence in that the damage award was inadequate.
IV. The trial court erred by failing to grant plaintiff's [sic] motion for a new trial on the jury's finding of damages related to defendant edel's conduct, and the trial court's failure to correct this finding, both of which were against the manifest weight of the evidence in that the future damage award was inadequate.
 {¶ 40} In their first assignment of error, plaintiffs contend that the trial court erred in failing to instruct the jury on joint and several liability. We agree.
 {¶ 41} This issue is in large part controlled by the decision of the Ohio Supreme Court in Pang v. Minch (1990), 53 Ohio St.3d 186.
 {¶ 42} The syllabus of the Pang court states in part:
5. Where a plaintiff suffers a single injury as a result of the tortiuous acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm.
6. Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor. * * *
7. 2 Restatement of the Law 2d, Torts (1965), Section 433B(2) is applicable where a single, indivisible injury is proximately caused by the successive tortious acts of multiple defendants.
 {¶ 43} In Pang, the plaintiff, Gordon Pang ("Pang") was injured in three automobile accidents occurring respectively on June 1, August 21 and October 15, 1984. Pang brought a negligence action in the common pleas court against the three defendants responsible for the operation of the motor vehicles involved in the three accidents.
 {¶ 44} Following the June 1 accident, but prior to the second accident, Pang was examined by his personal physician, Dr. Mark Roth. Dr. Roth diagnosed lumbar myofascitis and concluded that the condition resulted from the June 1 accident. During the same time period, Pang was also examined by Dr. Moses Leeb, an orthopedic surgeon, who also diagnosed lumbar myofascitis resulting from the June 1 accident. Dr. Leeb concluded at that time that Pang was experiencing some improvement in his condition.
 {¶ 45} Pang injured his lower back and exacerbated his pre-existing condition in the August 21, 1984 accident. Following this second accident, Pang saw Dr. Centanni, a chiropractor, who administered heat and manipulated adjustment to his back. Dr. Centanni concluded that Pang's symptoms were directly related to the August 21 accident. Following his second accident, Pang also saw Dr. Leeb for complaints of persistent pain in the lumbosacral region. By October 9, 1984, Dr. Leeb reported that Pang's condition had continued to improve.
 {¶ 46} Following his third accident on October 15, 1984, Pang reported to a hospital emergency room where x-rays were taken of his back and pain medication was prescribed. Thereafter, Pang returned to see Dr. Centanni, who opined that treatments were necessitated by the October 15, 1984 accident. Later, Pang was examined by Dr. Leeb, who found lumbosacral tenderness, spasm, and limitation of motion.
 {¶ 47} On November 27, 1984, Pang consulted his family physician, Dr. Roth, complaining of chronic lower back pain. Dr. Roth's diagnosis was "lumbosacral myofascitis." On January 17, 1985, Dr. Roth, after examining Pang, again concluded that Pang was suffering from lumbosacral myofascitis.
 {¶ 48} On February 3, 1986, Pang was examined by Dr. Richard Kaufman, an orthopedic surgeon. Dr. Kaufman diagnosed "chronic lumbosacral myofascitis" and concluded that it was the result of the three automobile accidents. Later examinations showed marginal easing of the pain and tenderness. However, Dr. Kaufman opined that the remaining discomfort was of a permanent nature and would preclude employment activities in which Pang had previously engaged.
 {¶ 49} In Pang, the jury returned verdicts in favor of Pang and against the three defendants severally. One of the defendants, Lynn Minch, appealed the judgment to the court of appeals. Pang filed a cross-appeal. The court of appeals overruled all of the assignments of error advanced by Minch but sustained Pang's assignment of error on his cross-appeal. On appeal to the Ohio Supreme Court, the Pang court stated:
In the case at bar, it was clearly established that each of the appellants was negligent and that each negligent act was a substantial factor in producing the permanent injuries to appellee's back. Evidence was also presented to the jury from which it could conclude that appellee suffered indivisible harm as a result of all three accidents. Accordingly, the evidence adduced by appellees was sufficient to obtain joint and several judgments against all three appellants. The burden to apportion the harm was thereafter the responsibility of appellants.
Id. at 198-199.
 {¶ 50} Citing App.R. 12(B), the Pang court held that it was error for the court of appeals to reverse the judgment of the trial court based solely upon the cross-appeal. Accordingly, the Pang court ordered that the trial court judgment be reinstated.
 {¶ 51} It is helpful to an understanding of Pang to set forth Restatement of the Law 2d, Torts (1965), Section 434:
(1) It is the function of the court to determine
(a) whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff;
(b) whether the harm to the plaintiff is capable of apportionment among two or more causes; and
(c) the questions of causation and apportionment, in any case in which the jury may not reasonably differ.
(2) It is the function of the jury to determine, in any case in which it may reasonably differ on the issue,
(a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, and
(b) the apportionment of the harm to two or more causes.
 {¶ 52} Comment d to Section 434 states:
The question whether the harm to the plaintiff is capable of apportionment among two or more causes is a question of law, and is for the decision of the court in all cases. Once it is determined that the harm is capable of being apportioned, the actual apportionment of the damages among the various causes is a question of fact, which is to be determined by the jury, unless the evidence is such that reasonable men could come to only one conclusion.
 {¶ 53} Pertinent here is footnote 4 of the Pang decision, which comments upon Section 434(1)(b) of the Restatement:
It is undoubtedly true that the determination of whether the harm sustained by the plaintiff is capable of apportionment constitutes a judicial function. 2 Restatement of the Law 2d, Torts (1965), Section 434(1)(b), Mathews v. Mills (1970), 288 Minn. 16, 23, 178 N.W.2d 841,845; Richardson v. Volkswagenwerk, A.G. (W.D.Mo. 1982), 552 F. Supp. 73,83. * * *
 {¶ 54} The syllabus of the Supreme Court of Minnesota in Mathewsv. Mills (1970), 288 Minn. 16, a case cited by the Pang court in footnote 4, states:
It is the function of the trial court to determine whether the burden of establishing that the injuries in a multiple-accident situation are capable of apportionment has been met. Whether or not the harm to the plaintiff is capable of apportionment among two or more causes is a question of law. Once the trial court determines that the harm is capable of apportionment, the question of actual apportionment of damages among several causes becomes one of fact to be determined by the jury.
 {¶ 55} In Richardson v. Volkswagenwerk, A.G. (W.D.Mo. 1982),552 F. Supp. 73, a case cited by the Pang court in footnote 4, the court states:
* * * Should the plaintiff's injuries be indivisible, the defendants are held jointly and severably liable as concurrent tortfeasors for plaintiff's total damage. If reasonable minds could differ on whether the plaintiff's injuries are divisible, the trier of fact determines whether the injury can be reasonably apportioned among the defendants and the extent of each defendant's liability.
* * *
* * * If the trial court determines that reasonable minds would not differ on the question of apportionment, the court may decide the issue and instruct the jury accordingly. Restatement (Second) of Torts § 434 (1965). Should the court believe that reasonable minds could differ, the question of apportionment of the harm, as well as liability and damages, is to be determined by the trier of fact. * * *
Id. at 80, 83-84.
 {¶ 56} In the instant case, plaintiffs proposed the following jury instructions:
Where a plaintiff suffers a single injury as a result of the negligent acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor
in producing the harm.
* * *
On the other hand, where the negligent conduct of two persons has combined to bring about harm to the plaintiffs, and one of the defendants (like Defendant Racan in this case) seeks to limit his liability on the ground that the harm is capable of apportionment among the defendants, the burden of proof as to the apportionment is upon the defendant to prove by a preponderance of the evidence that apportionment of damages.
* * *
Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in the same point of time, but in point of consequence, in producing a single indivisible injury. Where the negligence of two or more persons concurs to produce a single indivisible injury, then both persons are jointly and severally liable to the injured party. Therefore, if you find that the negligent acts of Defendant Racan and the negligent acts of Defendant Edel combined together to produce a single indivisible injury to Plaintiff Lisa Sotos, then you will need only to determine the amount of damages sustained by the plaintiffs [sic]. If on the other hand you find that the negligent acts of either defendant Racan or defendant Edel produced separate and divisible injuries to Plaintiff Lisa Sotos Collins, then you must determine what damages, if any, were the direct and proximate result of each defendants acts.
(Emphasis sic; footnotes omitted.)
 {¶ 57} The trial court heard arguments from counsel regarding the proposed instructions. Plaintiffs' counsel argued:
This is a single injury. It is a chronic pain syndrome that she has encountered. We can call it by a number of names and we know it does and frequently does evolve from sprain to myofascial pain syndrome to fibromyalgia.
Now the only difference in those pain syndromes and pain, chronic pain conditions is the extent over which the body feels those particular pains. But the condition itself — the evidence that's been presented through Dr. Pease — is that she received this pain syndrome as a direct and proximate result of the original collision. It continued to escalate and continued to escalate to a full-blown fibromyalgia where more than 11 points of her body have the pain.
So when we are looking at the single indivisible injury, the single indivisible injury is the creation of a musculoskeletal sprain/strain injury which develops into a multiple area condition. That's the single indivisible injury, therefore, it should be applied.
(Tr. 530-531.)
 {¶ 58} After hearing arguments of counsel, the trial court rejected plaintiffs' proposed jury instructions on joint and several liability. The trial court explained:
The problem I have here * * * we have fibromyalgia which is, as I understand it, can be brought about by trauma to lots of different places to the body.
This case I have read [Pang], and it is singularly damage to the lumbar region of the back in all three cases. And so in the first instance, I don't think we have a single identifiable injury as a result of our collision number one and collision number two. And, therefore, I don't think Pang applies.
(Tr. 532.)
 {¶ 59} The trial court gave the following instruction to the jury:
If you find by the preponderance of the evidence that the plaintiff has proven that she suffered injury from the first accident, you must then determine what damages are attributable to the first accident.
If you find by the preponderance of the evidence that the plaintiff has proven that she suffered injury from the second accident, you must then determine what damages are attributable to the second accident.
If you find that the plaintiff suffered injury from the first accident, and you further believe that the plaintiff has proven by a preponderance of the evidence that damages from the first accident were incurred even after the second accident of March 29, 1998, then you must apportion those damages that are attributable to the first and second accidents and award those damages to the plaintiff and against the defendant Racan or defendant Edel, dependent upon which accident you believe caused those damages.
If you find plaintiff suffered injury from the first accident, but you believe that the plaintiff has failed to prove by a preponderance of the evidence that damages from the first accident were incurred even after the date of the second accident, or you find that the plaintiff has failed to prove which damages incurred after the date of the second accident are attributable to the first accident, then the plaintiff has failed in her burden of proof on that issue and you are only permitted to consider those damages which were incurred after May 17 [sic], 1997, but before May 29 [sic], 1998, as being attributable to the defendant Joseph Racan.
(Tr. 627-628.)
 {¶ 60} We find that the trial court erred in refusing to instruct the jury on joint and several liability with respect to the fibromyalgia diagnosis. Fibromyalgia, by definition, is a harm that is indivisible. The issue to be determined at trial was whether the negligence of Racan was a substantial factor in producing fibromyalgia. If it were determined that Racan's negligence was a substantial factor in producing fibromyalgia, then we have a single indivisible injury (fibromyalgia) that is proximately caused by the successive tortious acts of both defendants. Parenthetically, we note that Edel did not appear for trial and thus did not contest plaintiffs' evidence that Edel's negligence was a substantial factor in producing fibromyalgia.
 {¶ 61} Plaintiffs clearly presented a prima facie case that Lisa sustained an indivisible harm and that the negligence of both defendants was a substantial factor in producing the indivisible harm. As previously noted, Dr. Pease testified at trial that, although Lisa did not have fibromyalgia when he first examined her after the second accident, by November 1998 she had fibromyalgia. Dr. Pease further testified to a reasonable degree of medical certainty that both accidents "contributed" to Lisa's fibromyalgia and that he could not allocate by percentages the respective contributions of the two accidents to Lisa's fibromyalgia.
 {¶ 62} While plaintiffs presented a prima facie case that Lisa suffered an indivisible harm caused by both automobile accidents based upon the fibromyalgia diagnosis, defendant Racan also presented evidence upon which reasonable minds could conclude that the first automobile accident did not contribute to or cause fibromyalgia.
 {¶ 63} The jury could discount Dr. Pease's opinion that both automobile accidents contributed to the fibromyalgia that was not diagnosed until some eight months after the second accident. The jury could find that the fibromyalgia was proximately caused by the second injury only. The jury could reach this conclusion in light of Dr. Waylonis's prognosis prior to the second accident that Lisa would achieve full recovery and in light of Lisa's employment history before and after the second accident. The jury could also find that the fibromyalgia was proximately caused by the second injury only based upon the low impact of the first collision and the fact that fibromyalgia was not diagnosed until well after the second high impact collision.
 {¶ 64} Thus, the trial court should have concluded, as a question of law, that reasonable minds can differ as to whether the fibromyalgia diagnosis presents an indivisible harm proximately caused by both defendants or a harm caused by defendant Edel only.
 {¶ 65} Plaintiffs also argue that, even without the fibromyalgia diagnosis, the injury or harm suffered by Lisa as a result of the two accidents is indivisible. In this regard, plaintiffs rely upon the testimony of Drs. Waylonis, Berarducci, and Pease. From these testimonies, plaintiffs argue that the indivisible injury is myofascial pain syndrome. Plaintiffs point out that Dr. Waylonis testified that when he examined Lisa on September 22, 1997 after the first accident, but prior to the second accident, he concluded that she suffered from "localized myofascial pain in that shoulder and probably had sustained a cervical and dorsal strain syndrome." (Waylonis Depo., at 27.)
 {¶ 66} After the second accident, Lisa was examined in December 1998 by Dr. Albert Berarducci, who opined that Lisa suffered from "chronic pain syndrome with major depression." (Berarducci Depo., at 46, 56.) The diagnosis was also described as "myofascial pain syndrome." (Depo. 56.) Dr. Berarducci stated that Lisa's "condition was triggered by the accidents." (Dep. 73.) However, Dr. Berarducci's use of the word "trigger" did not equate with proximate cause because "I don't believe that an accident causes the syndrome, it unleashes it." (Depo. 74.) During Dr. Berarducci's deposition, the following exchange occurred:
Q. In your opinion was the chronic progressive pain syndrome that you observed and determined, was that caused by the combined affect [sic] of the two collisions?
A. No.
Q. Was it precipitated by the combined affect [sic] of those two collisions?
A. By history it was precipitated by the first one, spurred by the second, but the development of the chronic pain syndrome was spurred, developed, caused by the cumulative affect [sic] of the two years of inciting events, physical reaction, subjective interpretation of those physical reactions, emotional response, failed therapies, and frustrations with the medical system that developed.
That's a package deal. You can't separate one single entity out of that and say that's the cause of the event.
(Berarducci Depo. at 57.)
 {¶ 67} In September 1998, when Dr. Pease first examined Lisa, his initial diagnosis was "multiple muscle strains and injuries related to the accidents." (Tr. 154.) Dr. Pease also stated that his initial conclusion was that Lisa had "sprains and strains of the ligaments and muscles." (Depo. 219.)
 {¶ 68} Based upon the testimonies of Drs. Waylonis, Berarducci, and Pease upon which plaintiffs rely, we conclude that plaintiffs failed to present a prima facie case that Lisa's injuries from the two accidents are indivisible absent the fibromyalgia diagnosis from Dr. Pease. To begin, Dr. Berarducci refused to opine that the two automobile accidents were the proximate cause of Lisa's injuries. Thus, Dr. Berarducci's testimony fails to advance plaintiffs' case.
 {¶ 69} Moreover, it is not at all clear whether the diagnosis from Dr. Waylonis prior to the first accident and the initial diagnosis from Dr. Pease after the second accident can be viewed as medically similar. Significantly, plaintiffs failed to present a medical expert to opine to a reasonable degree of medical certainty that both automobile accidents produced indivisible injuries absent the fibromyalgia diagnosis. This case is unlike the scenario in Pang, where the plaintiff produced an opinion from Dr. Kaufman that the "chronic lumbosacral myofascitis" was the result of the three automobile accidents. We must therefore conclude that plaintiffs failed to meet their burden of showing that both automobile accidents proximately caused an indivisible injury absent the fibromyalgia diagnosis from Dr. Pease.
 {¶ 70} We find that the trial court should have concluded, as a question of law, that reasonable minds can differ as to whether the negligence of Racan was a substantial factor in producing Lisa's fibromyalgia. We find that the trial court should have concluded, as a question of law, that if reasonable minds were to conclude that the negligence of Racan was a substantial factor in producing Lisa's fibromyalgia, then the plaintiffs have met their burden of proof by demonstrating that Lisa suffers a single indivisible injury (fibromyalgia) caused by both defendants, and joint and several liability is appropriate. Thus, the trial court was required, as a matter of law, to instruct the jury on joint and several liability with respect to Lisa's fibromyalgia claim, and its failure to do so was reversible error.
 {¶ 71} Based upon the foregoing, plaintiffs' first assignment of error is sustained in part and overruled in part.
 {¶ 72} In their second assignment of error, plaintiffs contend that the trial court erred by accepting the jury's damages award against defendant Edel instead of rendering its own independent determination of damages to be awarded against Edel.
 {¶ 73} Addressing the entry of default judgment, Civ.R. 55(A) states in part:
* * * If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall when applicable accord a right of trial by jury to the parties.
 {¶ 74} A default judgment may not be granted without a hearing unless the amount claimed is liquidated or capable of mathematical computation from documents or affidavits contained in the record.Columbus Mgmt. Co. v. Nichols (Aug. 4, 1992), Franklin App. No. 92AP-191, citing Buckeye Supply Co. v. Northeast Drilling Co. (1985),24 Ohio App.3d 134.
 {¶ 75} It is within the trial court's discretion as to the nature and type of the damages hearing, but one is required where evidence is necessary to establish damages, since, pursuant to Civ.R. 8(D), damages are not admitted by failure to file an answer. Stickney v. Ervin (Dec. 5, 1989), Franklin App. No. 89AP-616.
 {¶ 76} Because Edel failed to respond to the complaint, on June 29, 2000, plaintiffs moved for default judgment and requested a hearing to determine the amount of damages. Initially, a court magistrate scheduled a damages hearing, but on November 13, 2000, the trial court, by agreed entry, set aside the damages hearing, noting that it would be scheduled at a later date.
 {¶ 77} At trial, prior to voire dire, plaintiffs moved the trial court to consider the jury's determination of damages as to Edel as "advisory" and that the trial court itself determine damages against Edel. (Tr. 7.) The trial court rejected plaintiffs' proposition by indicating that the jury's decision would be accepted as to damages against Edel.
 {¶ 78} After the jury rendered its verdict, plaintiffs filed a post-trial motion on July 17, 2002 captioned "Plaintiffs Motion For Additur Proper Determination of Damages."
 {¶ 79} In their post-trial motion, plaintiffs again argued that under Civ.R. 55, the trial court must view the jury's verdict against Edel as "advisory" and that the trial court must make its own determination as to damages against Edel. In its decision denying plaintiffs' motion, the trial court wrote "the Plaintiffs apparently overlooked the last phrase of the Rule which enables a Court to empanel a jury to determine damages award which is exactly how damages were determined in this case at the request of the parties." In a footnote, the trial court noted that plaintiffs had submitted a jury interrogatory that asked the jurors to allocate damages caused by Edel.
 {¶ 80} We are aware of no authority holding that a jury verdict on damages involving a defaulting defendant is to be viewed by the trial court as advisory only. Nor do the cases cited by plaintiffs support such proposition.
 {¶ 81} The plain language of Civ.R. 55(A) states that the trial court "shall when applicable accord a right of trial by jury to the parties." We find that the trial court appropriately referred to that part of the rule in denying plaintiffs' post-trial motion.
 {¶ 82} Had the original negligence action against Edel proceeded without adding Racan, a hearing before a magistrate on damages would have been appropriate under Civ.R. 55(A) since Edel failed to appear in the action. However, with the addition of Racan as a defendant, it made sense to try the action against Edel and Racan to the jury. This is particularly so given plaintiffs' claim that defendants are jointly and severally liable.
 {¶ 83} We therefore overrule plaintiffs' second assignment of error.
 {¶ 84} In their third assignment of error, plaintiffs contend that the jury's failure to award any damages for pain and suffering for injury caused by the negligence of defendant Racan is against the manifest weight of the evidence and is therefore reversible error. Plaintiffs contend that the jury's failure to award any damages for future pain and suffering for injury caused by the negligence of defendant Edel is against the manifest weight of the evidence and is therefore reversible error. We agree.
 {¶ 85} Civ.R. 59(A) provides in pertinent part:
A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
* * *
(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
* * *
(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]
 {¶ 86} In Nevins. v. Ohio Dept. of Transp. (1998), 132 Ohio App.3d 6,21, this court stated:
When the claim is that the jury verdict is against the manifest weight of the evidence, a reviewing court must examine the entire record to determine if the verdict is supported by some competent, credible evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279
* * *. An appellate court will not overturn a verdict supported by competent, credible evidence. Seasons Coal, 10 Ohio St.3d at 80 * * *. Without evidence in the record reflecting that the jury was wrongfully influenced or that the award was manifestly excessive or inadequate, a reviewing court may not interfere with a jury's verdict on damages.Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 655 * * *.
When the award to the injured party is so inadequate as to deny the party justice, the trial court should grant a new trial. Miller v. Irvin
(1988), 49 Ohio App.3d 96, 98 * * *. Upon review, the asserted inadequate award must shock the reasonable sensibilities in order to be determined against the manifest weight of the evidence. Bailey v. Allberry (1993),88 Ohio App.3d 432 * * *.
 {¶ 87} The decision of the Second District Court of Appeals inBailey v. Allberry (1993), 88 Ohio App.3d 432, cited by this court inNevins, is particularly instructive here. Lonnie Bailey ("Bailey") was injured while riding as a passenger in a vehicle being driven by a co-worker, David Brackett. Brackett lost control of his vehicle while driving approximately 50 m.p.h. in a 35 m.p.h. zone and collided with a van. Brackett died as a result of his injuries. Bailey was ejected from the car's T-top roof and suffered two fractured cervical vertebrae and a cerebral concussion. Thereafter, Bailey sued the administrator of Brackett's estate for compensatory damages resulting from injuries he sustained in the accident.
 {¶ 88} Following trial, the jury awarded Bailey damages in the total amount of $25,500. The jury interrogatories revealed that the award included $16,349 for past medical expenses, $7,315 for lost wages, and $1,836 for pain and suffering to the time of trial. The jury awarded zero damages for "pain, suffering and impairment in the future."
 {¶ 89} The trial court denied Bailey's motion for new trial or additur on the issue of damages, and Bailey appealed to the court of appeals.
 {¶ 90} The court of appeals found that the jury's verdict, in light of the evidence as to Bailey's pain and suffering up to the time of trial, and his probable pain, suffering and impairment in the future is so disproportionate as to shock reasonable sensibilities and indicates that the jury lost its way in assessing compensatory damages.
 {¶ 91} With respect to the jury's failure to assess damages for pain and suffering up to the time of trial, the appellate court explained:
* * * [T]he evidence is undisputed that Bailey was hospitalized for ten days, wore the halo device for sixty-seven days, missed five months of work, experienced a reduced activity level, was left with facial scars, and is still suffering from chronic neck pain. For the pain and suffering resulting from these experiences, the jury awarded Bailey $1,836. We find that this award cannot be reconciled with the undisputed evidence in this case and/or is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim.
Id. at 437.
 {¶ 92} The appellate court also found that the jury lost its way in failing to assess future pain and suffering "with respect to the chronic neck pain which the record shows continues to plague Bailey." Id. at 441.
 {¶ 93} The appellate court in Bailey reversed and remanded for a new trial on the issue of damages.
 {¶ 94} In the instant case, the jury awarded to Lisa total damages in the amount of $18,951.10 for her injury caused by Racan. The jury answered an interrogatory that itemizes total damages against Racan as follows:
 Past expenses for hospitals, doctors, medications and medical care $ 13,617.77
Past physical pain $ 0 
 Past anxiety, mental suffering, and emotional distress $ 0 
 Past loss of enjoyment of activities or pleasures of life $ 0 
Past lost wages or income $ 5,333.33 
Future physical pain $ 0 
 Future anxiety, mental suffering, and emotional distress $ 0 
 Future loss of enjoyment of activities or pleasures of life $ 0 
Future lost wages or income $ 0 
 {¶ 95} We find that the jury's verdict that failed to award any damages against Racan for past physical pain, for past anxiety, mental suffering, and emotional distress and for past loss of enjoyment of activities or pleasures of life is against the manifest weight of the evidence and shocks reasonable sensibilities.
 {¶ 96} Pursuant to the stipulation of the parties, the trial court admitted into evidence plaintiffs' exhibit 3, which is a summary of medical expenses, lost wages and other expenses incurred by Lisa between the dates of the two automobile accidents, i.e., between May 29, 1997, and March 17, 1998. Obviously, responsibility for those expenses can only be attributed to Racan. Plaintiffs' exhibit 3 indicates total expenses of $24,171.24, which includes lost wages of $10,353.47. As plaintiffs point out here, if the lost income claim ($10,353.47) is subtracted from total expenses ($24,171.24), the result is $13,817.77, which is $200 more than the jury awarded for past medical expenses. Apparently, the jury agreed with Racan's counsel that the $200 expense for hiring someone to rake leaves was not appropriate to award. In short, the evidence of record readily shows how the jury came to award Lisa $13,617.71 for past medical expenses. The record shows that the jury awarded Lisa all of her medical expenses claimed between the two automobile collisions.
 {¶ 97} Given that the jury found that Racan is responsible for all of Lisa's medical expenses claimed prior to the second accident, it shocks reasonable sensibilities to award zero damages for the pain and suffering associated with the necessity of having to undergo those medical treatments. We find that the jury's failure to award any damages for pain and suffering cannot be reconciled with its award of damages for medical expenses and lost wages. We conclude that the jury lost its way in assessing damages against Racan.
 {¶ 98} Moreover, expert medical testimony relevant to the time period between the two automobile accidents undisputedly indicates that Lisa endured pain and suffering as a result of Racan's negligent conduct. As previously noted, Lisa presented to a hospital emergency room the evening of the first accident. The diagnosis on the date of injury was "cervical mid back to low back strain." Lisa returned to the hospital emergency room on June 6, 1997, and at that time the emergency room physician's impression was "acute cervical strain, continued pain."
 {¶ 99} Approximately four months after the accident, Lisa was examined by Dr. Waylonis on September 22, 1997. His diagnosis was "Post traumatic cervical and thoracic strain syndrome with localized post traumatic myofascial pain."
 {¶ 100} In late December 1997, Lisa began treatment with Dr. Anderson who noted that Lisa had been involved in an automobile accident and that she had suffered significant neck pain and low back pain. On that date, Lisa complained of having severe pain in the left lower neck with some radiation down into her shoulder. By March 13, 1998, Dr. Anderson's diagnosis was "post-traumatic myofascial pain syndrome."
 {¶ 101} We find that the jury's failure to award Lisa damages against Racan for any pain and suffering is against the manifest weight of the medical testimony. Racan presented no evidence, medical or otherwise, to even suggest that Lisa's pain complaints to her doctors were exaggerated. That Lisa suffered pain as a result of the May 29, 1997 automobile accident was not truly at issue at trial. Under such circumstances, we find that the jury's failure to award any damages for pain and suffering was against the manifest weight of the evidence.
 {¶ 102} In denying plaintiffs' motion for a new trial, the trial court found that it was not inconsistent to award stipulated medical expenses, yet refuse to award pain and suffering when Lisa did not testify as to the extent of pain that she experienced. The trial court noted that Racan reminded the jury at closing argument that Lisa had not testified.
 {¶ 103} We disagree with Racan's suggestion that Lisa's decision not to testify about her pain permitted the jury to reject undisputed medical testimony that Lisa suffered pain as a result of the first accident. We further note that if Racan felt that Lisa's testimony would be beneficial or even necessary to a defense of the claim, Racan had the right to call Lisa to the stand as on cross-examination. Apparently, both counsel for plaintiffs and counsel for Racan felt that, as a matter of trial strategy, Lisa should not be asked to testify. Clearly, under the circumstances of this case, no inference can be reasonably drawn from Lisa's failure to testify that she did not suffer pain as a result of the automobile accident of May 29, 1997.
 {¶ 104} We thus find that the jury's failure to award damages to Lisa and against Racan for pain and suffering was against the manifest weight of the evidence, and the trial court's failure to grant a new trial was an abuse of discretion.
 {¶ 105} Therefore, we sustain plaintiffs' third assignment of error.
 {¶ 106} In the instant case, the jury awarded Lisa total damages in the amount of $129,916.22 for her injury caused by Edel. The jury answered an interrogatory that itemizes total damages against Edel as follows:
 Past expenses for hospitals, doctors medications and medical care $ 40,910.22
Past physical pain $ 7,500.00
 Past anxiety, mental suffering, and emotional distress $ 10,000.00
 Past loss of enjoyment of activities or pleasures of life $ 7,500.00
Past lost wages or income $ 64,000.00
Future physical pain $ 0 
 Future anxiety, mental suffering, and emotional distress $ 0 
 Future loss of enjoyment of activities or pleasures of life $ 0 
Future lost wages or income $ 0 
 {¶ 107} We now turn to plaintiffs' fourth assignment of error. The interrogatory reveals that the jury awarded $25,000 in damages to Lisa for past pain and suffering and zero damages for future pain and suffering. Plaintiffs contend that the jury's failure to award damages for future pain and suffering is against the manifest weight of the evidence. We agree.
 {¶ 108} Of the physicians who examined Lisa after the second accident, i.e., after March 17, 1998, all testified that Lisa has chronic or permanent injuries resulting from the second accident.
 {¶ 109} As previously noted, after her second accident, Lisa continued treatment with Dr. Anderson, her family doctor. Dr. Anderson's deposition was taken on May 21, 2002, and it was read to the jury at trial. (Tr. 451.) In his deposition, Dr. Anderson testified that he last saw Lisa on April 19, 2002, about one month prior to the deposition. At the time of the deposition, Dr. Anderson was seeing Lisa about every two months. Dr. Anderson testified that Lisa was improving significantly. Her pain levels had diminished significantly, but she still has pain and still needs medication for pain. In Dr. Anderson's opinion "I don't think this is something that's gonna go away." (Depo. 31.)
 {¶ 110} When Dr. Anderson examined Lisa in April 2002, less than three months prior to trial, she was still experiencing cognitive difficulties relating to "thinking, reasoning, word finding, elocution." (Anderson Depo., at 31.) Dr. Anderson opined that Lisa will never be able to return to her job as a trial attorney, although he hopes that she will eventually be able to return to some form of employment as an attorney. According to Dr. Anderson, Lisa will need medical and psychological treatment in the future. Lisa "will always have some problems." (Depo. 34.)
 {¶ 111} Chiropractor Jerome Stetz began regularly treating Lisa beginning August 10, 1998. Dr. Stetz testified at trial. At the time of trial, Dr. Stetz was treating Lisa every six weeks, but initially he treated her daily and then three times a week for quite some time. Dr. Stetz treated Lisa for a "spinal column sprain/strain injury that was severe enough to alter the normal muscles of her spine." (Tr. 440.) To a reasonable degree of chiropractic certainty, it was Dr. Stetz's opinion that Lisa will likely require chiropractic treatments for the remainder of her life. He also opined that Lisa was experiencing significant pain.
 {¶ 112} Psychologist Roxanne Lewis, Ph.D., began treating Lisa in September 1998, some six months after the second accident. Dr. Lewis testified at trial. At the time of trial, Dr. Lewis had last seen Lisa on July 3, 2002, less than a week before the trial began. Dr. Lewis had treated Lisa "intermittently" during the almost four-year period. (Tr. 260.) Dr. Lewis's initial working diagnosis for Lisa was "major depression." (Tr. 269.) Early on in the treatments, Lisa was experiencing "cognitive problems" relating to "thinking, solving problems, understanding, comprehending." (Tr. 269.) Lisa also experiences anxiety. Dr. Lewis opined that, as of the day of trial, Lisa was not able to function as a trial lawyer or even as a lawyer.
 {¶ 113} According to Dr. Lewis, Lisa suffers from significant sleep disruption associated with her depression. Lisa undergoes a cycle between depression and difficulty functioning to getting her motivation back and starting to push herself, which then leads to discomfort and pain and a setback to depression. This cycle has become chronic. Dr. Lewis testified that, to a reasonable degree of professional certainty, Lisa is not expected to ever fully recover from this chronic cycle, although she may experience some improvement over time. Dr. Lewis testified to a reasonable degree of professional certainty that Lisa will need treatment for her depression "for a long, long, long, time." (Tr. 298.)
 {¶ 114} Here, Racan argues that the jury had evidence from Dr. Waylonis upon which they could determine that Lisa should not be awarded damages for future pain and suffering caused by the second automobile accident involving Edel. Racan points out that Dr. Waylonis did not find indicia of fibromyalgia and he also opined that the prognosis was favorable for a full recovery.
 {¶ 115} The problem with Racan's argument is that Dr. Waylonis only examined Lisa one time — on September 22, 1997 — prior to the second accident. His prognosis for a full recovery relates only to the injuries sustained by Lisa from the first accident. Dr. Waylonis's testimony is irrelevant to the issue here of whether the jury had evidence upon which it could rely to assess zero damages for future pain and suffering relating to the second accident.
 {¶ 116} Here, Racan further argues that Racan's cross-examination of Dr. Pease at trial could have led the jury to conclude that they did not believe Dr. Pease's diagnosis of fibromyalgia after the second accident. By this argument, Racan suggests that discounting Dr. Pease's opinion that Lisa acquired fibromyalgia after the second accident somehow produces evidence that Lisa had recovered from her injuries resulting from the second accident. Racan's suggestion is incorrect. Dr. Pease had initially diagnosed multiple muscle strains and injuries related to the accidents. He further testified that by November 1998, using the 18 tender points criteria established by the American College of Rheumatology, Lisa had the threshold 11 tender points on her body that established the fibromyalgia diagnosis. There was no testimony from Dr. Pease upon which the jury could conclude that, by the time of trial, Lisa had recovered from the injuries caused by the second automobile accident.
 {¶ 117} Based upon our review of all the medical evidence of record, we conclude that the jury's failure to assess damages against Edel for Lisa's future pain and suffering was against the manifest weight of the evidence. Bailey, supra.
 {¶ 118} We therefore sustain plaintiffs' fourth assignment of error.
 {¶ 119} For the foregoing reasons, plaintiffs' first assignment of error is sustained in part and overruled in part, plaintiffs' second assignment of error is overruled, and plaintiffs' third and fourth assignments of error are sustained. The judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
BROWN and McCORMAC, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.