**[Cite as *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 2010-Ohio-4969.]**

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ERIC SCHNETZ, et al.

     Plaintiffs

     v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

     Defendant
     Case No. 2006-07406

Judge Clark B. Weaver Sr.

DECISION

{¶ 1} Plaintiffs brought this action alleging negligence. The issues of liability and damages were bifurcated for trial. Following a trial on the issue of liability, the court issued judgment in favor of plaintiffs with a 50 percent reduction in plaintiffs' damage award to account for plaintiffs' comparative fault. The case then proceeded to trial on the issue of damages.

{¶ 2} In 2004, plaintiff was an inmate in the custody and control of defendant at the Mansfield Correctional Camp (the camp).[1] On November 25, 2004, plaintiff participated in the annual "Turkey day" intramural football game pitting Dorm A against Dorm B. Defendant's corrections officers were aware that inmates had sustained injuries in the past when the level of physical contact during such games had "gotten out of hand." In fact, defendant's policy prohibited inmates from playing full-contact, tackle football. Instead, the inmates' football games were restricted to the limited-contact style

---

[1]The term "plaintiff" shall be used in reference to Eric Schnetz throughout this decision.

known as flag football. In such a contest, the ball carrier is stopped by pulling out a flag attached to his waist; tackling is prohibited.

{¶ 3} The play on that day soon became very rough, to the point at which inmates began playing tackle football. On one particular play, plaintiff sped towards an opposing ball carrier, inmate Jerome Westfield, preparing to make a tackle. When the two players collided, plaintiff fell back and landed on the ground, face down. According to Westfield, as plaintiff lay motionless on the turf, "he said he couldn't feel his legs." Plaintiff had injured his spinal cord and he is now quadriplegic.

LIABILITY DECISION

{¶ 4} The evidence established that defendant knew or should have known that a prohibited game of tackle football was taking place and that defendant could have or should have stopped the activity prior to plaintiff's injury. The evidence, however, also established that plaintiff failed to use due care for his own safety when he continued to participate in the game after having knowledge that tackle football was being played and that he could sustain physical injury in such a contest. Based upon the totality of the evidence, the court found that the negligence of plaintiff was equal to that of defendant and that fault should be apportioned 50 percent to plaintiff and 50 percent to defendant.

PLAINTIFF'S INJURY

{¶ 5} Fredrick M. Frost M.D. is board-certified in both spinal cord medicine and physical medicine and rehabilitation. He is the former Director of the Cleveland Metro-Health Medical Center, which is part of the Cleveland Clinic. Dr. Frost was first asked to consult on plaintiff's case in November 2005 and he has continued to see plaintiff as a patient since that time. According to Dr. Frost, plaintiff is a C4, class A quadriplegic meaning that his nerves have been damaged at the fourth vertebra of the cervical spine and that the injury is of the most severe classification.

{¶ 6} Dr. Frost found that plaintiff had no muscle control in his arms, trunk, or legs; that he has only limited movement in his right biceps muscle and a weak shoulder shrug; and that he is "totally paralyzed from a muscle standpoint." Plaintiff's quadriplegia is accompanied by a tightening of his shoulder and leg joints as well as muscle spasms which cause involuntary movements of his limbs.

{¶ 7} Dr. Benson Bonyo is a board-certified family practitioner who has been plaintiff's primary care physician since 2005. Dr. Bonyo sees plaintiff about once per month at Canal Pointe, a residential nursing facility where plaintiff has been living since 2005. He also sees plaintiff at various hospitals and other medical facilities when plaintiff is transferred to such facilities for emergent care. According to Dr. Bonyo, plaintiff remains in stable condition but suffers from several chronic medical conditions related to his quadriplegia including urinary tract infections requiring periodic hospitalization, chronic constipation also requiring hospitalization, and bed sores. Plaintiff also suffers from autonomic dysreflexia, a complication often associated with quadriplegia, and which is characterized by sudden and precipitous elevations or "spikes," in a patient's blood pressure, severe headaches, and neck pain. According to Dr. Bonyo, a sudden, unchecked spike in a patient's blood pressure can lead to stroke.

{¶ 8} Other medical conditions caused by plaintiff's paralysis include neurological bowel and bladder, severe and chronic skin ulcers, and nail disease. Plaintiff has a surgically implanted latex tube in his bladder to help him eliminate urine, a cough stimulator to help him expel secretions from his lungs, and a bowel program which is administered every two to three days. Dr. Frost noted that plaintiff has been hospitalized on numerous occasions for complications related to these conditions, most frequently due to bladder infections and bowel impactions.

PLAINTIFF'S LIFE CARE

{¶ 9} Dr. Bonyo maintains that plaintiff will require round-the-clock care from a Licensed Practical Nurse (LPN), for the remainder of his life. He did not believe that a nurse's aide could provide the level of care needed by plaintiff, due to the nature and severity of plaintiff's complications.

{¶ 10} In Dr. Frost's opinion, patients such as plaintiff benefit from in-home care because they can be with their families. Dr. Frost stated that for plaintiff to return home, he would need either a specially constructed or a retrofitted, handicapped-accessible home, a specially designed bed, wheelchair, shower, bathing chairs, etc., an inventory of supplies for his bowel and bladder programs, and medications. He estimated that plaintiff would need, at a minimum, one full-time adult home-health aide at all times and that he would require visits from a nurse or LPN once or twice a month. Dr. Frost

acknowledged that a second home-health aide would be needed to move plaintiff to and from his bed unless a specialized mechanical lift was available at the home. More frequent visits from a nurse or physician would also be required should plaintiff's skin ulcers worsen. Dr. Frost stated that it is important for a patient in plaintiff's condition to adhere to a strict diet and to maintain proper weight for the health and safety of both the patient and his caregivers.

{¶ 11} In order for plaintiff to travel outside the home, he would require a specially manufactured, handicap-accessible van, the cost of which would be included in the life-care plan, and he would also require a home-health aide to accompany him.

PLAINTIFF'S LIFE EXPECTANCY

{¶ 12} Dr. Frost testified that, in spite of plaintiff's catastrophic injury, plaintiff will likely have a "fairly normal life expectancy." He acknowledged that, as a quadriplegic, plaintiff will likely face injury-related health issues that can result in death such as breathing problems and septicemia; and that potentially life-threatening complications of autonomic dysreflexia can be triggered by the bowel and bladder problems experienced by plaintiff. Dr. Frost was familiar with the 2004 Annual Statistical Report for Spinal Cord Injury Care Systems (Model Report) and he is aware that it purports to be a compilation of longevity data for individuals with various degrees of spinal cord damage. He acknowledged that, according to the Model Report, plaintiff's predicted life expectancy is roughly 17 to 20 years shorter than a similarly-situated adult male who does not have a spinal cord injury. Dr. Frost could not agree that the report was a reliable predictor of life expectancy for individuals with spinal cord injuries, but he did admit that the information contained in the report was "the best we have."

{¶ 13} Thomas Wantanabe M.D. testified as an expert for defendant. Dr. Wantanabe is licensed to practice medicine in three states, including Ohio, and he is board-certified in physical medicine and rehabilitation with a specialization in neurological rehabilitation. Dr. Wantanabe noted that even though plaintiff is currently able to breath on his own, some of plaintiff's "accessory muscles of respiration are not active." According to Dr. Wantanabe, plaintiff's respiratory compromise increases the risk of infection which can lead to pneumonia and death. Other complications observed by Dr. Wantanabe include skin ulcers which can lead to infection and a potential fatal

condition known as septicemia; compromised bowel and bladder function that can lead to urinary tract infection, bowel impactions, and other, more serious, "complications of the kidney system"; and respiratory complications.

{¶ 14} Dr. Wantanabe believed that the Model Report was a reliable resource for determining plaintiff's life expectancy. In his opinion, plaintiff will live another 25 to 30 years.

{¶ 15} According to U.S. Dept. of Labor statistics, a typical male of plaintiff's current age is expected to live to the age of 80 years. In light of the undisputed testimony regarding plaintiff's injuries and associated medical complications such as autonomic dysreflexia and chronic skin ulcers, and weighing the conflicting opinion testimony on the issue, the court finds that plaintiff is not likely to have the same longevity as a similarly-situated adult male without such injury and complications. The court, however, is not convinced that the Model Report is totally reliable given the information gathering and reporting inconsistencies acknowledged by Dr. Wantanabe during his cross-examination. In the final analysis, the weight of the evidence persuades the court that the extent of plaintiff's injury and the seriousness of the associated medical complications has negatively impacted his life expectancy. Thus, the court will make the appropriate adjustment in plaintiff's damage award to account for that fact.


IN-HOME CARE OR FACILITY CARE

{¶ 16} There is no dispute that plaintiff will require round-the-clock care for the remainder of his life. Plaintiff believes that care can be best provided to him in a specially-constructed home of his own with the aid of a full-time live-in LPN, as it is his desire to live more independently. Plaintiff testified that he would prefer to have his mother live with him along with the live-in nurse. He did not feel comfortable living at his own home with only a live-in nurse's aide. Plaintiff was hopeful that moving to his own home would improve his relationship with his children.

{¶ 17} Defendant has not taken a position whether plaintiff should be cared for in a home of his own or in a managed-care facility. Defendant however, has argued that if plaintiff chooses to live in his own home, he will require only a live-in home-health aide but not an LPN.

{¶ 18} The weight of the medical evidence in this case convinces the court that the best outcome for plaintiff will be achieved by way of a live-in medical facility such as the one in which he currently resides.  Indeed, the "day-in-the-life" videotape viewed by the court evidences the tremendous man-and-machine power required to transport plaintiff both within the facility for plaintiff's daily needs and outside of the facility for medical and other necessary services.  In the view of the court, such extreme measures are beyond that which can be reasonably provided to plaintiff if he is living on his own with a single live-in caregiver.  For example, plaintiff's autonomic dysreflexia has and will continue to cause sudden, life-threatening complications which must be immediately treated by a medical professional.  Plaintiff's bowel and bladder program and his cough stimulator require constant attention, not to mention the skin ulcers which require plaintiff to be moved frequently and which require varying degrees of medical intervention on a continuing basis.  The court is also aware that plaintiff is a large man and that he appears to have gained weight since the liability trial.  The court believes that he will likely continue to do so in the near future given the limited caloric requirements of a patient in plaintiff's condition.  The increased weight magnifies the chance of an injury to plaintiff or a caregiver.

{¶ 19} Although plaintiff's mother, Christine Sears, testified that she would be willing to move into plaintiff's home and help with the cooking and cleaning, she acknowledged that she is disabled due to a back injury and that she cannot lift more than five pounds.  She has no training or experience relevant to the care of a patient in plaintiff's condition.  Plaintiff's expert life-care planner, George Cyphers, testified that a managed-care facility was "the only safe option for plaintiff if no family members were available to care for him."  Cyphers did not believe that Sears could provide care for plaintiff given her own fragile health.

{¶ 20} Nonetheless, plaintiff may elect to live in a home of his own.  Plaintiff, of course, is free to chose whatever accommodations he wishes.  However, for purposes of determining a reasonable estimate of plaintiff's damages, the evidence convinces the court that plaintiff's award should be based upon the costs of a live-in facility such as Canal Point.

COST OF CARE

{¶ 21} The evidence regarding plaintiff's facility care is that the cost of such care in 2010 will be $160,787. Applying a two-percent rate of inflation and then reducing that figure by a discount factor of four percent, plaintiff's expert accountant, Greg Weisheit, a Certified Public Accountant and Certified Investment Advisor, arrived at a net present value of $5,092,638 for care at plaintiff's facility. Although Weisheit speculated that the cost of medical care will likely increase at a greater rate than the general rate of inflation, the court is not convinced concerning the reliability of that assumption and the court believes that the standard rate should apply.

{¶ 22} Although defendant's economist, Dr. Gerald Lynch, employed a slightly different method for calculating present value, defendant did not seriously contest either the yearly costs for facility care or the net present value of such care. Rather, as noted above, defendant questioned plaintiff's anticipated longevity. Accordingly, making an appropriate adjustment to the figures presented by plaintiff's expert in order to account for a somewhat shorter life expectancy, the court finds that the total cost of plaintiff's life-care in a live-in medical facility will be $4.5 million.

{¶ 23} With regard to the cost of the medical care plaintiff has thus far received, the testimony is that the costs total $1.49 million and that all such costs have been covered either by defendant during the period of plaintiff's incarceration or by Medicaid thereafter. Thus, plaintiff has paid no out-of-pocket costs for the medical care attributable to his injury and the court will make no award for such costs. See R.C. 2743.02(D).

LOST WAGES

{¶ 24} At the time of his injury, plaintiff was a 26-year-old able-bodied man with a high school education and some on-the-job training in the field of residential plumbing. Beginning in March 2000, plaintiff worked full-time as a laborer for Sandy Plumbing until February 2003, when he lost his job due to absences attributable to his conviction and subsequent incarceration for domestic violence. As of that date, plaintiff was earning $12.50 per hour, plus health insurance and a paid vacation benefit.

{¶ 25} Weisheit made the following assumptions in performing a wage loss calculation: 1) that plaintiff would have continued to pursue on-the-job training as a plumber; 2) that he would have achieved certification as a plumber; 3) that he would

have earned prevailing union wages and benefits; 4) that he would have worked as a plumber on a full-time basis for the remainder of his work life. According to Weisheit, the present value of plaintiff's past and future lost wages is $2.3 million.

{¶ 26} Defendant contends that given plaintiff's sporadic pre-injury employment in a furniture warehouse and as a gas station attendant, and in light of plaintiff's prior incarceration, plaintiff would have never obtained employment as a plumber and that his future lost wages would have been much lower than the amount that plaintiff seeks.

{¶ 27} Plaintiff testified that he was born in 1978 and that he has a high school education.
Plaintiff is divorced and he has three children, Chloe born December 12, 2002, Shelby, born October 2, 2000, and Michael who was born January 14, 2004. Anna Jeter is plaintiff's ex-wife and is Shelby's mother; Nicole O'Day, plaintiff's ex-girlfriend, is mother to both Michael and Chloe.

{¶ 28} Plaintiff's legal problems began in 2003 when he pleaded guilty to misdemeanor domestic violence for an offense that occurred in 2000; a charge of endangering children was dismissed. He committed a second offense in January 2004, when his son Michael was just a newborn. As a result of that offense, plaintiff pleaded guilty to felony domestic violence and he was sentenced to a term of one year of incarceration with post-release control. O'Day was the victim of both instances of domestic violence for which plaintiff was charged.

{¶ 29} Plaintiff bases his contention that he would have achieved both licensure and full-time employment as a plumber upon his relatively brief employment history with Sandy Plumbing. Marvin Cox, owner and operator of Sandy Plumbing, testified that plaintiff was a hard-working employee who worked primarily on new construction. Cox fired plaintiff from his job for absenteeism which Cox attributed to plaintiff's legal problems. He stated however, that he would have given consideration to rehiring plaintiff after plaintiff had served his prison sentence.

{¶ 30} Weisheit testified that he used the Department of Labor (DOL) statistics for a journeyman plumber working in plaintiff's geographic area to determine plaintiff's wage rate. At trial, the experts agreed that the prevailing wage rates for federal projects are referred to in the field as "Davis, Bacon Wages." Weisheit also referred to the DOL statistics in forming his opinion that plaintiff would continue to engage in full-time

employment as a plumber through age 65. Based upon these assumptions, and making an appropriate adjustment for the present value of plaintiff's future wages, he opined that the net present value of plaintiff's total past and future wage loss is $2,302,679.

{¶ 31} Defendant insists that plaintiff's legal problems would have continued or worsened in the future and that these issues would have undermined his efforts to become a plumber or to otherwise find gainful employment. However, based upon the totality of the evidence the court is convinced that plaintiff would have continued to pursue a career as a plumber following his release from prison and that he would have eventually obtained both licensure and full-time employment as a plumber. The court also finds that, more likely than not, plaintiff would not have continued to run afoul of the law. The court, however, is not convinced that plaintiff would have earned the wages that Weisheit believes he would have earned.

{¶ 32} Weisheit's opinion that plaintiff would have earned more than $2.3 million over his work life is based upon several assumptions which, in the opinion of the court, are mistaken. For example, Weisheit assumed that plaintiff would immediately obtain full-time employment as a plumber after his release from incarceration and that he would earn prevailing wages and benefits, including an employer-subsidized pension. Weisheit assumed that plaintiff would continue to earn such wages and benefits in a full-time capacity over his entire work life and that he would have also earned overtime wages during that period of time. He conceded however, upon cross-examination, that it would be some time before plaintiff could achieve licensure as a plumber after leaving prison. Indeed, plaintiff's former employer testified that a minimum of six years of on-the-job training with a licensed plumber are required in Ohio before one can take the licensing examination. The court further finds that there will likely be a period of time thereafter when plaintiff's ability to earn top wages and benefits would be impaired due to his two prior convictions. Weisheit admitted making some adjustment to his initial estimate after he read the report of defendant's expert economist, Dr. Gerald Lynch. He also acknowledged that plaintiff's single highest yearly wage prior to his imprisonment was only $25,000.

{¶ 33} Dr. Lynch received his Ph.D. in economics from Kentucky University and he is a professor of economics at Purdue University. Dr. Lynch testified that several

adjustments in plaintiff's wage-loss estimate needed to be made in order to account for periods of time when the typical plumber is unemployed either due to a layoff, job loss, injury, or prolonged illness. He noted that plaintiff had already filed three prior workers' compensation claims in his relatively short work life. Using DOL statistics and making the aforementioned adjustments, Dr. Lynch opined that plaintiff would work 2,000 hours per year until the age of 65. Utilizing plaintiff's earnings while employed at Sandy Plumbing and projecting those wages into the future, Dr. Lynch estimated plaintiff's lost wages at $859,763.

{¶ 34} On cross-examination, Dr. Lynch admitted that he did not believe plaintiff could obtain licensure as a plumber and that the hourly rate he employed in calculating plaintiff's lost wages was that of a laborer, not a licensed plumber. He also conceded that both plumbers and laborers are eligible to earn overtime wages but that he did not consider overtime hours in his calculation.

{¶ 35} Based upon the totality of the evidence, the court finds that the present value of plaintiff's past and future wage loss is $1.5 million. To the extent that plaintiff seeks an additional award of lost wages to account for the financial support plaintiff likely would have provided to his children, such an award will be made in connection with the children's claim and then set off against plaintiff's award.

PAST AND FUTURE PAIN AND SUFFERING

{¶ 36} Although plaintiff's injuries are both catastrophic and permanent, he cannot feel physical pain below the shoulders. Nevertheless, plaintiff testified that he does experience significant, chronic soreness in his shoulders and, according to Dr. Bonyo, plaintiff has been prescribed morphine to ease the pain. Additionally, as noted above, autonomic dysreflexia causes severe and discomforting spikes in plaintiff's blood pressure as well as painful headaches, both of which can require hospitalization.

{¶ 37} With respect to plaintiff's mental state, plaintiff's father, Roger Schnetz, testified that, after the accident, plaintiff's outlook on life changed for the worse and that plaintiff became very unhappy with his condition. Schnetz stated that plaintiff's mood has subsequently improved and that he has become more "accepting" of his condition. Schnetz attributes this improvement to the fact that plaintiff now anticipates a damage

award in this case that will allow him to provide for his children and improve his own comfort level.

{¶ 38} Penny L. Griffith, Ph.D., is a clinical psychologist with a doctorate degree in special education who has treated plaintiff at Northeast Ohio Behavior Health. Dr. Griffith testified by way of deposition and she referred to plaintiff's mental health records during her testimony. Dr. Griffith noted that plaintiff's mental status has improved over time and that he no longer focuses on his physical problems and disabilities. According to Dr. Griffith, plaintiff tries to focus more on his family and children but he feels anger and hopelessness when it comes to the care of his children by their respective custodians, especially care provided to the two youngest children.

{¶ 39} Based upon the totality of the evidence, the court finds that plaintiff should be compensated for past pain and suffering in the amount of $250,000 representing the time between the injury and the date of trial. And, in consideration of the court's prior determination regarding plaintiff's life expectancy, plaintiff should be compensated in the amount of $1 million for his future pain and suffering.


LOSS OF ENJOYMENT

{¶ 40} In *Fantozzi v. Sandusky Cement Prod. Co.*, 64 Ohio St.3d 601, 1992-Ohio-138, paragraph two of the syllabus, the court held that an individual who suffers personal injuries, may also recover damages for "loss of ability to perform the plaintiff's usual functions." This element of plaintiff's damages is separate and distinct from physical and mental pain and suffering and includes "the basic mechanical bodily movements that accommodate walking, climbing stairs, feeding oneself, driving a car," as well as those "usual activities of life that have actually provided distinct pleasure to this particular plaintiff, these being the so-called 'hedonic' damages." Id. at 614. In this case, plaintiff must also be compensated for the additional years he would have lived had he not been injured. In other words, hedonic damages will be awarded to plaintiff based upon a normal life expectancy of 80 years of age.

{¶ 41} In his post-trial brief, plaintiff requests an award of $11 million for his "pain and suffering and loss of enjoyment of life." Defendant argues that such an award is excessive.

{¶ 42} With regard to plaintiff's pre-injury physical condition, plaintiff's former employer at Sandy Plumbing regarded plaintiff's physical strength as an asset on the job site and he described plaintiff as a "young, muscular, strapping kid." Plaintiff's father, Roger Schnetz, testified that plaintiff enjoyed playing football and fishing as a young man and that he was an accomplished BMX bike racer from sixth grade through high school. According to the elder Schnetz, plaintiff loved to work on cars and "he could just about fix anything." Plaintiff's mother testified that plaintiff had a close relationship with his children before he went to prison and that he now "lives for his children."

{¶ 43} An award of damages for the loss of one's enjoyment of life is the most difficult element of plaintiff's award to quantify with any degree of certainty. Based upon the totality of the evidence, the court determines that an award to plaintiff in the amount of $1.5 million is reasonable and necessary compensation for such loss.

LOSS OF SERVICES

{¶ 44} Plaintiff admitted that his relationship with his oldest child, Shelby, was not as close as he would like it to be and that he has not seen her in more than 18 months. According to plaintiff and his parents, neither she nor the other children feel comfortable visiting their father at Canal Point.

{¶ 45} Plaintiff and other family members testified that plaintiff's relationship with Chloe and Michael's mother, Michelle O'Day, is strained and that O'Day and her boyfriend have demanded that plaintiff provide them with financial support in exchange for the privilege of seeing his two youngest children. Plaintiff has not seen either child since the summer of 2009. None of the children gave testimony in this case.

{¶ 46} Based upon the evidence provided to the court, the court finds that plaintiff's children have suffered damages in the form of loss of plaintiff's parental consortium as a result of his injury. In consideration of the relative ages of the children, the court fixes these damages at a present value of $28,000 for Michael, $22,000 for Chloe and $10,000 for Shelby.

{¶ 47} With regard to the loss of financial support both past and future, the court finds that plaintiff would have provided financial support to his three children until each child reached the age of 18 years. According to the evidence, plaintiff had been

ordered, at various times, to pay child support to both Jeter and O'Day, but those orders were based upon the relative income of the parties at the time as well as other factors which have likely changed since that time. Consequently, such information is not particularly helpful to the court in determining an appropriate award in this case.

{¶ 48} Cypher estimated the present value of child support plaintiff would likely pay for his three children over the relevant time period at $160,767. Cypher's figures, however, were based upon a somewhat inflated earnings estimate provided by Weisheit. Adjusting this figure to account for plaintiff's probable earnings over the relevant period results in a present award of $100,000 in lost child support for plaintiff's three children, which shall be apportioned as follows: $40,000 for Michael; $35,000 for Chloe; and $25,000 for Shelby. As noted above, and in order to prevent a double recovery, the child support award shall be set off against plaintiff's lost wages of $1.5 million.

PLAINTIFF'S TOTAL DAMAGES

{¶ 49} As a result of the foregoing, the court finds that plaintiff has sustained compensable damages totaling $8.65 million, distributed as follows: $4.5 million for plaintiff's life-care; $1.4 million for past and future lost wages, which sum has been reduced by $100,000 to account for that portion of plaintiff's past and future wages that shall be awarded to plaintiff's three children; $1.25 million for past and future pain and suffering; and $1.5 million for loss of enjoyment of life.

{¶ 50} As a further result of the foregoing, the court finds that plaintiff's children have sustained compensable damages as follows: 1) $68,000 for Michael; 2) $57,000 for Chloe; and 3) $35,000 for Shelby.

{¶ 51} As the court has previously concluded in this action, plaintiffs' damages are to be reduced by 50 percent to account for the contributory negligence of plaintiff Eric Schnetz. Accordingly, plaintiff, Eric Schnetz, shall be awarded total damages in the amount of $4,325,000. Plaintiffs Michael, Chloe, and Shelby shall be awarded damages in the total amount of $34,000, $28,500, and $17,500 respectively.

Court of Claims of Ohio

ERIC SCHNETZ, et al.

      Plaintiffs

      v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

      Defendant
      Case No. 2006-07406

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of plaintiffs' damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff, Eric Schnetz, in the amount of $4,325,025 which includes the filing fee paid by plaintiffs. Judgment is rendered in favor of the remaining plaintiffs as follows: $34,000 for Michael Schnetz; $28,500 for Chloe Schnetz; and $17,500 for Shelby Schnetz. Court costs are assessed against defendant. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

                              _____
                              CLARK B. WEAVER SR.
                              Judge

cc:

Brian M. Kneafsey, Jr.
Christopher P. Conomy
James P. Dinsmore
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

David C. Sheldon
669 West Liberty Street
Medina, Ohio 44256

LP/cmd
Filed September 13, 2010/To S.C. reporter October 12, 2010